PATRICIA R., Individually, and Kristie R. by mother and next friend, Patricia R., Appellants,

v.

George SULLIVAN, Owen Bartlett, and James O. Campbell, d/b/a Casa Del Norte Apartments, and Raywall, a Division of Tennessee Plastics, Inc., Appellees.

No. 4120.

Supreme Court of Alaska.

July 10, 1981.

A. Lee Petersen, Anchorage, for appellants.

Susan Wright Mason, Atkinson, Conway, Bell & Gagnon, Anchorage, for appellee Casa Del Norte.

Robert L. Eastaugh, Delaney, Wiles, Moore, Hayes & Reitman, Anchorage, for appellee Raywall.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and VAN HOOMISSEN, Superior Court Judge.

## OPINION

MATTHEWS, Justice.

On February 20, 1974, two-year old Kristie R. received serious burns on her face, neck and shoulders, apparently from the electric baseboard heater in her bedroom. Her mother, Patricia R., brought suit in superior court on her own and on Kristie's behalf against the owners of their apartment building, George Sullivan, Owen Bartlett and James O. Campbell. The landlords later named the manufacturer of the heater, Raywall, as a third-party defendant.[1] The plaintiffs then amended their complaint to seek damages from Raywall, as well as from the landlords. After a trial the jury returned special verdicts in favor of the landlords and Raywall.

On appeal the plaintiffs charge that the trial judge erred in admitting evidence that Patricia had engaged in acts of prostitution, and in excluding testimony offered by their expert witness. They further argue that several of the jury instructions inadequately stated the law and that the special verdict form was deficient.

For the reasons set out below, we conclude that the trial judge erred in admitting evidence concerning Patricia's prostitution and that a new trial is therefore required. Because the case will be retried, we also discuss the plaintiffs' claims regarding the excluded evidence, the jury instructions and the special verdict form.

## I. FACTUAL BACKGROUND

On December 24, 1973, Patricia, Kristie and Harold Wilson moved into a two-bed-room, furnished apartment in the Casa Del Norte Apartments. The apartment was heated by electric baseboard heaters. Patricia testified that the heater in Kristie's bedroom put out excessive heat, even after she turned the thermostat in the room to 40 degrees, its lowest setting. She also testified that three or four days after moving in she complained to Ruby Brooner, the apartment manager, and requested that the heater be repaired. On a later occasion she claimed to have asked Wilson to speak to Ms. Brooner about the problem, again with no results. Both Wilson and Brooner, however, contradicted these statements. Finally, Patricia testified that she rearranged the furniture, placing the head of the bed in front of the heater in order to protect her daughter from it. However, when this was done, some 10 inches of the heater extended beyond one side of the bed.

Patricia testified that on the evening of February 20, 1974, Kristie became sleepy at the dinner table and was put to bed for a nap. After dinner, Wilson went into the other bedroom to lie down. Although Wilson's testimony differs, Patricia further testified that after clearing the table, she went into the living room to watch television. Shortly thereafter she heard Kristie whimpering in her room. She got up to check on her and found Kristie standing beside the bed. The child's face was pink and she pointed to her shoulder. Patricia tried to remove Kristie's shirt but it was stuck to her skin. Realizing that Kristie was badly burned, Patricia called to Wilson for help. After packing the burn in ice, they rushed the child to the hospital.

At the hospital Patricia noticed that Kristie was also burned on both ears, and on the back of her neck near the hairline. Because she had not been put to bed for the night, Kristie was still wearing a pair of nylon pants and a nylon and cotton knit shirt which had to be cut off. The infant

---

1. Also impleaded were Wolverine Electrical & Engineering Company, Inc., which had provided specifications for the electrical work in the apartment complex, and Richard Burr Electric, a contractor that had allegedly worked on installation of the heater. Burr was later dismissed from the case and Wolverine, which had gone bankrupt, had a default judgment entered against it.

was then examined and treated by a plastic surgeon and burn specialist, Dr. Addington.

Although Wilson did not testify at trial, he gave a different account of the incident in his deposition, which was admitted into evidence. He testified that both he and Patricia were lying in their bed. They heard the child scream and both ran into her bedroom where they found her wedged, upside down, between the wall and the headboard of the bed. Wilson testified that he reached over and pulled the little girl free. They immediately noticed she was burned and threw a blanket around her, then hurried to Providence Hospital.

Kristie was hospitalized for four or five days. She underwent several skin grafts over the next few weeks. Although the record on appeal does not indicate the extent of scarring that remained after the surgery, the plaintiffs contend that she will have scars for the rest of her life.

## II. THE PROSTITUTION EVIDENCE

The plaintiffs' first argument on appeal is that the trial judge committed prejudicial error by permitting the jury to hear evidence that Patricia had engaged in acts of prostitution in the months prior to her daughter's accident. The trial judge initially excluded the evidence on the ground that its potential relevance was outweighed by its prejudicial impact. After extensive argument by defense counsel, he withdrew his ruling and permitted cross-examination of Patricia about the circumstances of her prostitution. The judge admonished the jury to consider the evidence solely as it related to Patricia's care of the child and not as it bore on her character or credibility.[2]

In addition to cross and re-direct examination of Patricia on the subject, the jury also heard a tape recording of Harold Wilson's deposition in which extensive reference was made to the prostitution issue. Although the trial court gave the jury no further instruction on how they were to consider this evidence,[3] all three attorneys mentioned prostitution in their closing arguments.

The evidence presented to the jury concerning prostitution, although not entirely consistent, disclosed that Patricia had en-

2. The judge told the jury:
They may make suggestions of misconduct or something else which may be legitimate to get into, or at least is something for you to consider, but the very nature of the inquiry may scandalize some people and the prejudice, as we say in the law business, the prejudice would tend to outweigh the probative value. We're getting into an area now where the word prostitution, and acts of prostitution are going to be suggested in questions, and may in fact be admitted by this witness. I don't know. They may be denied. There may in fact be other testimony, both, yes, there were acts of prostitution; no, there weren't. Well, it seemed to me that perhaps the prostitution hanging there that might so color your minds, some of you, that you couldn't give the evidence a fair hearing and weighing. But I've now decided otherwise. And I'm going to let the area be examined. But I tell you very strictly that the suggestion of prostitution, even if prostitution is admitted, it is not suggested or admitted for the purpose of showing that this witness, or any other, is a bad person. We're trying this case on the facts. Not on the reputation of the witness. Further, if acts of prostitution are admitted or suggested, that's not for the purpose, even if you find them to be established,

that doesn't at that point automatically establish that this witness is not to be believed. The activities of this witness may be considered by you only in the overall context of whether she exercised due care for the safety of the child Kristie. And I don't want you to start with this fixed in your mind that if a person engages in prostitution, he or she does not care for their children. But in order to allow full inquiry into the—the overall activities of this witness, I have just—I've come to the conclusion it's necessary that— to allow these kinds of questions. The two things that I tell you is that their own—that fact, if you find it to be established as a fact, that she did commit acts of prostitution, is to be considered only in the nature of her overall activities as far as child care.

3. In his final instructions, the judge did say, "you must not be influenced by sympathy, prejudice or passion." He cautioned the jury that "this case should be considered and decided by you as an action between persons of equal standing in the community, of equal worth and holding the same or similar stations in life. For the law is no respecter of persons. All persons stand equal before the law and are to be dealt with as equals in a court of justice."

gaged in five to ten acts of prostitution during the months of December 1973 and January 1974. According to Patricia the prostitution did not take place in February (the accident occurred on the 20th), and did not continue after the accident. She testified that she had been encouraged to engage in prostitution by Harold Wilson, who, by his own admission, benefitted from the proceeds. She also stated that when she indicated reluctance to continue, Wilson would threaten and beat her.[4] According to Patricia, the prostitution occasionally took place in the apartment, but never when her daughter was present. The child was left at the "Kiddie Drop" or with a babysitter, and was never left overnight.

■ In determining whether to admit relevant evidence, the trial court must balance its probative value against, 1) the danger that it will cause unfair prejudice and, 2) other factors, called by Wigmore "auxiliary principals of policy," such as confusion of issues, distraction of the jury, and undue delay.[5] However, no balancing is needed if the evidence is not relevant, or if it is relevant but is subject to a rule calling for its exclusion.

The prostitution evidence obviously carried with it a substantial danger of unfair prejudice. In our system of justice cases must be decided on the basis of what the parties have done, not who they are. "The business of the court is to try the case, and not the man; and a very bad man may have a very righteous cause."[6] Because

prostitutes are held in such low regard by most people in our society there is a considerable risk that a case such as this might be decided on a status or emotional basis, rather than on the facts. The trial judge, we think accurately, characterized the potential prejudice of the evidence, referring to "the extremely massive prejudice of talking prostitution before the jury." The danger was, in other words, that the jury would react with "overmastering hostility."[7]

The trial court ruled that the evidence of prostitution could be considered "only in the overall context of whether [Patricia] exercised due care for the safety of the child." Comparative negligence was an issue pertaining solely to the personal claim of Patricia, and the court evidently believed that because Patricia had acted as a prostitute in the past one could logically infer that she was acting as a prostitute at the time of the accident, and was therefore either absent or inattentive to the well-being of Kristie.[8]

■ Before allowing the questioned evidence to be admitted as evidence of how Patricia customarily or habitually spent her evenings, the court should have required a preliminary showing, out of the presence of the jury, to satisfy itself that the evidence did show that Patricia was working as a prostitute on most evenings during the period in which her child was injured.[9] As it developed during the trial there was no evidence that Patricia habitually engaged in acts of prostitution. Thus the evidence

4. In his deposition Wilson disputed Patricia's version of the facts, indicating that Patricia had willingly engaged in prostitution and had in fact come to Alaska intending to be a prostitute.

5. J. Wigmore, Evidence § 29A at 412, §§ 1171–1175 at 395–402 (Chadbourn rev. ed. 1974); see Alaska R.Evid. 403; *Davis v. Chism*, 513 P.2d 475, 479 (Alaska 1973).

6. *Thompson v. Church*, 1 Root 312 (Conn.1791) quoted in J. Wigmore, *supra* note 5, § 64 at 474.

7. *Adkinson v. State*, 611 P.2d 528, 532 (Alaska) *cert. denied*, —— U.S. ——, 101 S.Ct. 219, 66 L.Ed.2d 97 (1980).

8. The court suggested at one point in colloquy with counsel before making its ruling: "If there

is an intersection collision, and it can be substantially suggested that you ran the red stop sign every morning on your way to work, on the fiftieth day you participated in an intersection collision—at least that's the theory they are. . . ."

9. *See* Commentary, Alaska R.Evid. 406, which states in part:

In determining whether evidence shall be admissible, the court may look to Rule 104 and make a preliminary determination that it is a habit or a routine business practice that is being described. When an activity fails to achieve the status of a habit, evidence as to its practice must be excluded.

that she had engaged in prostitution on several occasions in the past should not have been admitted for the purpose of showing that she was so engaged when the accident took place. Merely because she had engaged in acts of prostitution does not give rise to an inference that she was away when her child was injured, any more than it would follow that because she had gone shopping or to the movies in the past she was away at the time in question. Likewise, it cannot be inferred from the fact that Patricia had occasionally engaged in prostitution at home that she was having sexual intercourse with a client at home when the child was burned.

■ The appellees argue that the trial court could have received the evidence in order to contradict what they regard as Patricia's efforts to prove that she was a person of good character. They claim that she did this by testifying that she had expected to marry Wilson, that she had spent her time in Alaska before the accident taking care of her child and Wilson,[10] and after the accident had worked as a cashier in a grocery store and as a babysitter.[11] In making this argument the appellees acknowledge that evidence of specific instances of bad conduct, such as acts of prostitution, may not be used to impeach the credibility of a witness. At the time of the trial this rule was codified as Alaska Rule of Civil Procedure 43(g)(11):

> A witness may be impeached by the party against whom he was called by contradictory evidence, or by evidence that his general reputation for truth is bad, or

that his moral character is such as to render him unworthy of belief. *He may not be impeached by evidence of particular wrongful acts*, except that it may be shown by the examination of the witness or the record of a judgment that he has been convicted of a crime. [Emphasis added].[12]

Appellees, however, urge that this rule does not apply here, because Patricia placed her character in issue, even though it was not properly an issue. In this circumstance they contend they were required to "fight fire with fire."

While there are circumstances in which the introduction of inadmissible evidence requires responding evidence, they do not exist in this case.[13] We see no instance in which Patricia can be said to have put her character in issue.[14] Furthermore, none of her testimony that has been brought to our attention would have been contradicted by the fact that she had engaged in acts of prostitution.[15] Therefore we reject the appellees' arguments on this point.

■ Raywall offers another justification for the admission of the evidence. It argues that it is "always proper to establish a witness' background and to place him in his setting by asking him what he is doing and what he has done for a living...." We agree that a preliminary line of questioning of that sort has some probative value and should generally be permitted. However, the relevance of such an inquiry is ordinarily slight, and when there is a danger of prejudice resulting from such an

10. She testified that she spent her time "being a mother, being with Harold. Staying at home with my child. And I went out, you know, in the evenings on—to dinner or—on, you know, occasion." This was elicited on cross examination.

11. Patricia also testified that her post accident work experiences included work as a clerk in a liquor store, and as a cocktail waitress.

12. Currently the rule is expressed in Alaska R.Evid. 608(b) and (c).

13. *See* C. McCormick, Law of Evidence § 57 at 131–33 (2d ed. 1972). Primarily those circumstances exist where the evidence is harmful

and was admitted over objection or motion to strike. Here there was no objection; indeed some of the testimony said to have opened the door for rebuttal was brought out by appellees. *See* note 10, *supra*.

14. A similar argument was made in *Lupro v. State*, 603 P.2d 468, 479 (Alaska 1979). We said there in rejecting the argument: "The questioning by the prosecutor does not in fact appear to have been a good faith attempt to rebut [the witness'] statements."

15. *See* C. McCormick, *supra* note 13, § 57 at 133, n. 52.

inquiry, the questioning should not be permitted. As we stated in *Poulin v. Zartman*, 542 P.2d 251, 262–63 (Alaska 1975), where the same justification was offered and rejected:

> But while such preliminary questioning is generally permitted, '[t]here is a duty to protect [a witness] from questions which go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate'. . . .
>
> Background or preliminary questions which are designed to discredit the witness as a person, and not as a witness are improper cross-examination. [citations and footnotes omitted].

Moreover, where the inquiry is designed to elicit testimony of prior wrongful acts, the prohibition against the use of wrongful acts for impeachment purposes must govern. We believe, therefore, that the evidence of Patricia's acts of prostitution could not have been received merely as background evidence.

■ The appellees assert that any error which might have been committed in admitting the evidence of prostitution was harmless. Our harmless error standard requires reversal only for errors which affect the substantial rights of the parties.[16] Substantial rights are affected unless one can say with fair assurance that the result "was not substantially swayed by the error." *Love v. State*, 457 P.2d 622, 631 (Alaska 1969), *quoting Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557, 1567 (1946). We cannot declare such a belief in this case.

■ The fact of Patricia's prior acts of prostitution may well have affected the

jury's consideration. It is such an inflammatory subject that any mention of it might color the jury's judgment, especially where the right of the person involved to recover money is at issue. But here there was more than a mere mention of prostitution. Patricia was fully cross examined concerning the subject and there were many references to it in the deposition testimony of Wilson. Further, counsel argued it at final argument. In so doing, counsel for Raywall went beyond the limited purpose for which the trial judge allowed the evidence, arguing that:

> [T]he very principal issue in this case, as we see it, is one of the credibility of Patricia R... The significance is not whether or not her conduct, the conduct that she describes, should be condoned or condemned, but rather whether Patricia has been truthful with you during the course of her testimony here at trial.

For those reasons, we believe that there is a substantial possibility that the jury's judgment of this case was affected by the admission of the evidence of prostitution.[17] The error committed in admitting the evidence was therefore not harmless.

## III. THE EXPERT TESTIMONY

Plaintiffs retained William E. Knox, an electrical engineer, to test the heater and to give expert testimony at the trial. As Mr. Knox was beginning to describe the tests that he had performed, both counsel for appellees objected on the grounds that there had been no showing that the tests were performed under conditions similar to the conditions of the actual accident, and that Knox was not qualified as an expert.

---

**16.** Alaska R.Civ.P. 61 states:

*Harmless Error.*

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or de-

fect in the proceeding which does not affect the substantial rights of the parties.

**17.** In addition, Kristie's claim was separate from that of her mother. The prostitution evidence was not arguably relevant to it. However, the evidence had the same likelihood of prejudicing her claim as that of her mother. No instruction explicitly limiting the use of this evidence to Patricia's claim was given. Further, we would question the effectiveness of such an instruction if it were given. *See generally* Commentary, Alaska R.Evid. 105.

After extensive arguments out of the presence of the jury, the court ruled that the tests would not be permitted because they were conducted under conditions too different from those which may have existed at the time of the accident.

Plaintiffs' counsel requested the opportunity to make a testimonial offer of proof. This request was denied and the trial judge ruled that the deposition of Knox, taken by appellees' counsel, would stand as the offer of proof. After this ruling the jury was recalled and plaintiffs' counsel offered Knox as an expert witness, intending evidently to elicit his opinions concerning the operation of the heater without reference to the tests. The judge then excused the jury and ruled that Knox' opinions would not be admitted. He explained that although he accepted Knox as an expert, Knox' opinions would be necessarily so closely tied to his tests that they would not be of appreciable assistance to the jury. The judge further stated that the tests had the potential to mislead the jury and would require an undue amount of time to rebut. Plaintiffs' counsel did not request a further opportunity to make an offer of proof after this ruling.

We expressed the standard for determining whether expert testimony should be received in *Crawford v. Rogers*, 406 P.2d 189, 192 (Alaska 1965):

> The true criterion in determining whether one qualifies as an expert witness and whether his opinion is admissible is not whether he employs his knowledge and skill professionally or commercially. The true criterion is whether the jury can receive appreciable help from this particular person on this particular subject. [Footnote omitted].

The decision on whether to admit expert testimony is committed to the sound discretion of the trial court, and is reviewable only for an abuse of that discretion.[18]

Knox performed eight tests. Four of them were done with the actual heater from Kristie's bedroom, and four others were done with a sample heater of the same model. In each of the tests Knox attached thermocouples in a vertical line, one on top and three along the face of the heater. The vertical line was near the left end of the heater, the portion which would not have been blocked by the head of Kristie's bed. Knox covered each of the thermocouples with a fiberglass insulation pad 3½ inches thick and approximately 4 inches square. He then turned the temperature control to its maximum setting, waited for the temperature to stabilize and recorded the temperature attained at each thermocouple.

On a number of the tests Knox blocked air flow around the heater using plywood and fiberglass.[19] The plywood blockage was effected by placing 18″ high plywood sections up against the "nose" of the heater, perpendicular to and resting on the floor. The fiberglass blocking was accomplished with a 3½ inch thick piece of foil-backed wall insulation, 10½ inches long, pushed against the heater. For the "tenting" in Test No. 8, Knox placed the bottom of a plywood sheet eight inches out from the wall, along the entire length of the heater. He then leaned the top of it against the wall over the heater.

■ There are at least two serious shortcomings in the tests. The first is that the thermocouples placed by Knox on the heaters were covered with insulation. Knox acknowledged in his deposition that this would tend to distort the temperature read-

---

18. *D. H. v. State*, 561 P.2d 294, 297 (Alaska 1977).

19. We have designated the Knox tests as follows:

Test No. 1 – Sample heater; no blockage.

Test No. 2 – Sample heater; plywood blocking all but 15″ of heater.

Test No. 3 – Sample heater; plywood blocking all but 10.5″ of heater.

Test No. 4 – Sample heater; same plywood as No. 2; fiberglass blocking 10.5″ exposed intake.

Test No. 5 – Actual heater; no blockage.

Test No. 6 – Actual heater; no plywood; fiberglass blocking 10.5″ of intake.

Test No. 7 – Actual heater; plywood plus fiberglass blockage (same as No. 4).

Test No. 8 – Actual heater; no fiberglass; plywood "tenting" entire length of heater.

ings. He expressed no view as to the extent of the distortion, and that is not a matter of common knowledge. Therefore, to the extent that the tests, or Knox' testimony based on them, were offered for the purpose of giving absolute temperature readings of uncovered surfaces, they would not have aided the jury.

The second major shortcoming, common to the tests we have designated Nos. 2, 3, 4, and 7,[20] is that the perpendicular piece of plywood against most of the heater cannot be said to have simulated the blockage caused by the bed. The plywood extended to the floor, while the headboard and lower box spring of Kristie's bed were elevated off the floor and would have allowed air to circulate underneath them. Thus the plywood blockage did not represent a fair approximation of the conditions believed to exist at the time of the accident.

Because of these two obvious deficiencies with Knox' testing we cannot say that the court abused its discretion in refusing to admit the test evidence.[21] As to the exclusion of Knox' opinion testimony apart from the tests, we are unable to say that error was committed. As previously noted, plaintiffs did not make an offer of proof concerning this aspect of Knox' testimony, nor

request leave of the court to do so.[22] Thus we can only speculate as to what Knox would have been asked and what his answers would have been.

However, we think that it is appropriate to make the following observations for the guidance of the court and counsel in the event that this case is retried. Plaintiffs' theory, germane to the Knox testimony, was that the control thermostat on the heater was stuck in an "on" position and would not shut off even when turned to its lowest point.[23] Knox' tests, among other things, were offered to show that while the heater was in a full on position that portion of the heater which extended beyond the bed, and was not blocked by the bed, was relatively cool. Plaintiffs theorized that Kristie, in her sleep, either climbed or fell out of bed and fell asleep on the cool portion of the heater. In doing so she blocked the air to that portion of the heater she was lying on, causing it to reach high temperatures and burn her.

The trial court's rationale for excluding the tests was that the conditions under which they were conducted were not sufficiently similar to the conditions which probably existed at the time of the accident. This rationale is not applicable to the tests

20. See note 19, supra.

21. The seminal Alaskan case concerning experimental evidence is Love v. State, 457 P.2d 622, 627–29 (Alaska 1969), where an experiment to show that a fishing boat could not have unintentionally drifted into restricted waters was held inadmissible because of the numerous dissimilarities between the experiment and the actual event. Justice Connor, writing for the court, articulated the rule:

It is stated almost universally that for such evidence to be admissible, it should have been developed under conditions substantially similar to those surrounding the event in issue. The rule of substantial similarity of conditions does not require an identity of conditions but only that degree of similarity which will insure that the results of the experiment are probative.

457 P.2d at 627. The trial judge has broad discretion in determining whether experimental evidence should be admitted. Id.; Stumbaugh v. State, 599 P.2d 166, 171 (Alaska 1979).

22. At the time of trial, the offer of proof requirement was contained in Alaska R.Civ.P. 43(c):

Record of Excluded Evidence. In an action tried by a jury, if an objection to a question propounded to a witness is sustained by the court, the examining attorney may make a specific offer of what he expects to prove by the answer of the witness. The court may require the offer to be made out of the hearing of the jury. The court may add such other or further statement as clearly shows the character of the evidence, the form in which it was offered, the objection made and the ruling thereon. In actions tried without a jury the same procedure may be followed, except that the court upon request shall take and report the evidence in full, unless it clearly appears that the evidence is not admissible on any ground or that the witness is privileged.

23. An electrician, Mr. Hrubes, who examined the heater a few weeks after the accident testified that this was his finding.

we have numbered 1, 5 and 8.[24] Tests 1 and 5 were designed simply to determine how hot the external surfaces of the heater would get when the thermostat control was locked in an on position. Engineers retained by the appellees had run a similar test and their expert was allowed, over objection, to testify to the readings he obtained. Test No. 8 was designed to determine whether a thermal overload safety device on the heater operated, and to show the external surface temperature of the heater when it did.

We think that tests 1, 5 and 8 were "experiments designed to show the general traits and capacities of materials involved in the controversy."[25] These tests did not purport to be simulating accident conditions. They were designed for the limited purposes described. Except for the fact that the temperature readings were distorted because the thermocouples were insulated, those three tests would tend to yield results helpful to the jury while having little potential for confusion or distraction.

Test No. 6 was evidently designed to demonstrate the surface temperatures which could be developed if a small object were lying against an otherwise unblocked heater. It is in the nature of a simulation. Plaintiffs' theory was that the infant with a blanket had fallen asleep against the heater. They were entitled to present proof that the resulting temperatures would have been high enough to cause burns.[26] Of course, it can be argued that a 10-inch scrap of fiberglass wall insulation is not a fair substitute for a child in a blanket, but that goes more to the weight than the admissibility of the test.[27]

The judge suggested at one point that because Kristie was burned on both ears she must have been "rolling around . . . thrashing around," and therefore her contact with the heater could not be simulated by material which was not similarly moving about. We think that this conclusion requires choosing between the conflicting testimony of Patricia R. and Wilson, selecting Wilson's version of the accident. Patricia R's testimony was consistent with the child's having been burned while sleeping. That she was burned on or near both ears can be viewed as indicative of nothing more than that she turned her head while lying on the heater. Assuming that the evidence will be similar to that which is now in the record, we do not think that on retrial plaintiffs should be required to simulate a moving child in their tests. In deciding whether or not a test or experiment should be admitted it is not the court's role to pick and choose among the various versions of the underlying incident, nor should it draw inferences which the jury would not necessarily draw.

## IV. THE JURY INSTRUCTIONS AND SPECIAL VERDICT

Plaintiffs contend that the court erred in failing to give their Proposed Instructions Nos. 33[28] and 34[29] relating to a manufac-

24. See note 19, supra.

25. C. McCormick, supra note 13, § 202, at 486–87.

26. The temperature distortion we have noted to have been caused by insulating the thermocouples would not necessarily exist in the case of test No. 6, because its evident object was to measure surface temperatures after the surface was covered.

27. Knox explained his use of fiberglass stating: I am blocking air circulation is all. I could have used something else, but fiberglass doesn't melt and doesn't burn, so it is eminently suitable for the application against this.

28. Proposed Instruction No. 33 states:
A product may be in a defective condition although no ascertainable defect or flaw in the product's manufacture or design is apparent and although the product was precisely what it was intended to be, if the manufacturer fails to give adequate and timely warnings as to dangers or hazards which may result from use of the product. In other words, the product is defective because the manufacturer does not provide adequate warnings to the users. To prevent such a product from being defective, the manufacturer must provide adequate warnings of the potential danger involved in using the product.

turer's duty to warn of dangers involved in the use of a product. Plaintiffs point out that the only instruction given by the court relating to a manufacturer's duty to warn was couched in terms of the negligence of the manufacturer [30] and was inappropriate to their claim for strict liability.[31]

■ We agree that the instruction given by the court was inappropriate for use in a strict liability case because it focuses on such negligence concepts and issues as whether the manufacturer had reason to know of the hazard involved in the use of the product, the manufacturer's duty to use reasonable care in giving a warning, and the manufacturer's reason to believe that the ordinary user would not recognize a danger. Moreover, the instruction does not define what an adequate warning would be.[32]

■ We are in accord with those authorities which hold that in strict liability cases the need for and the sufficiency of a warning should be expressed without reference to negligence principles.[33] As the Supreme Court of Washington recently stated:

[T]he objective of the rule of strict liability with respect to dangerous products is defeated if a plaintiff is required to prove that the defendant was negligent, or the latter is allowed to defend upon the ground that he was free of negligence. It is the adequacy of the warning which is given or the necessity of such a warning, which must command the jury's attention, not the defendant's conduct.

*Little v. PPG Industries*, 92 Wash.2d 118, 594 P.2d 911, 914 (Wash.1979).

■ However, Instruction No. 33 proposed by the plaintiffs is seriously flawed because it fails to note that a product is only required to have warnings as to those hazards or dangers that would not be readily recognized by the ordinary user of the product.[34] In other respects, too, Proposed Instructions 33 and 34 could be more clear. Upon retrial the court, with the assistance of the parties, should be able to devise appropriate instructions on this subject.

Various other objections are raised by the plaintiffs to the court's instructions pertain-

**29.** Proposed Instruction No. 34 states:

In order for a warning given by the manufacturer of a product to be adequate, it must indicate the scope of the danger, the extent or seriousness of the harm or injury that could result from the danger and the warning must be conspicuous and prominent so as to adequately alert the reasonable and prudent person as to its contents. Also, the warning should be such that if followed it would make the product safe for the users.

**30.** The instruction given by the court, Instruction No. 22, read as follows:

One who manufactures or supplies a product directly or through a third person for another to use which the supplier knows or has reason to know is dangerous or is likely to be dangerous for the use for which it is supplied, has a duty to use reasonable care and give warning of the dangerous condition of the product or of facts which cause it likely to be dangerous to those whom he should expect to use the product or be endangered by its probable use, if the supplier has reason to believe that they will not realize its dangerous condition. Failure to fulfill that duty is negligence.

**31.** We adopted strict products liability in *Clary v. Fifth Avenue Chrysler Center*, 454 P.2d 244 (Alaska 1969), holding that:

A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being.

**32.** For a thorough discussion of the issue of the adequacy of warnings *see First National Bank of Albuquerque v. Nor-Am Agricultural Products, Inc.*, 88 N.M. 34, 537 P.2d 682, 691–693 (1975); *see also Hiigel v. General Motors Corp.*, 190 Colo. 57, 544 P.2d 983, 988 (1975) *quoting Crane v. Sears, Roebuck & Co.*, 218 Cal.App.2d 855, 32 Cal.Rptr. 754 (1963).

**33.** *See Jackson v. Coast Paint & Lacquer Co.*, 499 F.2d 809, 812 (9th Cir. 1974); *Cavers v. Cushman Motor Sales, Inc.*, 95 Cal.App.3d 338, 157 Cal.Rptr. 142, 149 (1979); *Anderson v. Heron Eng'r. Co., Inc.*, 604 P.2d 674, 679 (Colo. 1979); *Hiigel v. General Motors Corp.*, 190 Colo. 57, 544 P.2d 983 (1975) (en banc); *Smith v. United States Gypsum Co.*, 612 P.2d 251, 254 n. 3 (Okl.1980); *Phillips v. Kimwood Machine Co.*, 269 Or. 485, 525 P.2d 1033, 1039 (1974); *Little v. PPG Industries*, 92 Wash.2d 118, 594 P.2d 911, 914 (1979).

**34.** *See Jackson v. Coast Paint & Lacquer Co.*, 499 F.2d 809, 812 (9th Cir. 1974). *See generally* Annot. 53 A.L.R.3d 239, 257–59 (1973).

ing to strict liability. After the trial of this case we decided *Caterpillar Tractor Co. v. Beck*, 593 P.2d 871 (Alaska 1979). In *Caterpillar* directions pertaining to the points raised are given. It is enough to say presently that upon retrial the instructions should be modified so that they are consistent with *Caterpillar*.

█ The plaintiffs argue that strict products liability should be extended to cover landlords of residential property. The briefing on this important question is conclusory only, without adequate citations to relevant authorities. Under these circumstances we consider this claim of error to have been waived.[35]

The plaintiffs also object to the form of the special verdict given to the jury. Specifically, the jury was required, upon finding for the plaintiffs, to: "list the defect or defects which you found to be a proximate cause of the injury to the plaintiffs;" "list the act or acts of negligence of [the landlords] which you found to be a proximate cause of the injury to the plaintiffs;" and "list the act or acts of negligence of Raywall which you found to be the proximate cause of the injury to the plaintiffs."

We have considerable doubt as to whether requiring these detailed answers was appropriate. The definition of a product defect is essentially functional. A product is defective if, for example, it has failed to perform as safely as an ordinary consumer would expect. *Caterpillar Tractor Co. v. Beck*, 593 P.2d at 885. The emphasis is on the failure of safe performance, rather than on the specific reasons for the failure. *Id.* Thus, as to strict liability, the special verdict form might have confused the jurors and lead them to believe that they had to find more than the law requires.

Similarly, we think that requiring a detailed explanation of the act or acts of negligence of the appellees is undesirable. The jurors may not be able to agree on phraseology or on the details of the conduct found to have been negligent. There is a danger that the jury might be deterred by

such a requirement from agreeing on a verdict which it otherwise would reach.

We have considered the various other claims made by the plaintiffs and find them to be without merit.

REVERSED AND REMANDED.

---

**35.** *Kristich v. State*, 550 P.2d 796, 804 (Alaska 1976).