Connie WALDEN, individually and
as Guardian of Shawn Walden,
Appellant/Cross–Appellee,

v.

DEPARTMENT OF TRANSPORTATION,
State of Alaska, Appellee/Cross–
Appellant.

Nos. S–8575, S–8576.

Supreme Court of Alaska.

July 13, 2001.

Peter J. Maassen, Ingaldson Maassen, and Peter Gruenstein, Gruenstein & Hickey, Anchorage, for Appellants/Cross–Appellee.

Andrew Guidi, Tim Lamb, Clyde E. Sniffen, Jr., Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc., Anchorage, for Appellee/Cross–Appellant.

Before MATTHEWS, Chief Justice, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. *INTRODUCTION*

Connie Walden, (Walde) individually and on behalf of her minor son, Shawn Walden, appeals the superior court's judgment following a jury trial that found the State of Alaska, Department of Transportation (DOT) not liable for injuries sustained by Shawn in a 1993 motor vehicle accident on the Parks Highway. Walden claims that the superior court erred in granting DOT's motion for partial summary judgment concerning her claim that DOT was negligent in failing to post a warning sign at the curve where the accident occurred. Walden further claims that she should be granted a new trial because the superior court abused its discretion by: (1) excluding evidence of prior accidents at the subject curve; (2) excluding a DOT Design Study Report that contained evidence that DOT had notice of a defect in the curve where the accident occurred, and failing to take steps to mitigate the effects of this ruling; (3) admitting testimony by defense expert John Myers regarding tests conducted by Myers and the speed of Mel Walden (the driver of the car in which Shawn was a passenger); (4) admitting evidence of the psychological condition of witness Clay Walden; and (5) excluding DOT's interrogatory answer regarding tests conducted by DOT's attorneys.

Because the trial court properly granted DOT's motion for partial summary judgment on the warning-sign issue and did not abuse its discretion in making any of the rulings that Walden challenges, we affirm.[1]

## II. *FACTS AND PROCEEDINGS*

### A. *Facts*

In the late afternoon of December 30, 1993, Mel Walden was driving north on the Parks Highway in a 1990 Hyundai Excel. His brother, Clay Walden, and Mel's 16–year–old son, Shawn Walden, were passengers in the car.

Driving conditions on the highway were generally good, though there were occasional patches of ice and wetness on the road. The posted speed limit was 55 m.p.h. Mel was driving between 45 and 55 m.p.h.

Mel slowed to 50 m.p.h. as he approached the curve near Mile 54, north of the Big Lake turnoff. As the Hyundai entered the curve, it hit a patch of ice and began to fishtail. Mel regained control of the car, but almost immediately lost control again as the car hit a second patch of ice. The car spun around and slid across the oncoming lane. Seeing a southbound vehicle coming directly towards him, Mel downshifted and attempted to avoid a collision by accelerating into the ditch on the left side of the highway. Before Mel reached the ditch, the other vehicle struck the Hyundai's right rear door, near where Shawn was sitting.

Shawn suffered catastrophic brain injuries as a result of the collision. He was hospitalized until March 1994 and still requires extensive medical care. Mel and Clay each received minor injuries.

### B. *Proceedings*

Connie Walden, individually and in her capacity as Shawn's representative, brought suit against DOT in October 1995, alleging that DOT should have posted a warning sign at the curve and that DOT's negligent maintenance of the highway curve was a substantial factor in Mel's loss of control. DOT moved for partial summary judgment, contending that it was not legally required to post a curve warning sign at the subject curve, and that its decision to use Willow sand to improve road traction was discretionary and shielded by sovereign immunity.

---

1. Because we are affirming the superior court's decision, we need not reach the issues raised in

DOT's cross-appeal. DOT brought its cross-appeal in the event of a remand.

The superior court granted the motion as to the curve but denied it as to the sand.

The case was heard by a jury in November and December 1997. The jury determined that Walden and Shawn had suffered damages in excess of $8 million,[2] but found Mel Walden entirely liable for the accident and did not apportion any liability to DOT. The trial court denied Walden's motion for a new trial.

Walden appeals.

## III. STANDARD OF REVIEW

■ We review the trial court's decision on DOT's partial summary judgment motion *de novo* to determine whether there were any genuine issues of material fact and whether DOT was entitled to judgment as a matter of law.[3] In reviewing questions of law, we apply our "independent judgment and adopt the rule of law that is most persuasive in light of precedent, reason, and policy." [4]

■ "The trial court's jury instructions generally involve questions of law [that] are subject to the independent judgment standard of review." [5]

■ We review the trial court's exclusion or admission of evidence for an abuse of discretion.[6] We will reverse a trial court's evidentiary ruling only when we are left with a definite and firm conviction that the trial court erred in its decision.[7] We also review a motion to reopen discovery for an abuse of discretion.[8]

## IV. DISCUSSION

### A. The Superior Court Properly Granted DOT's Motion for Partial Summary Judgment.

■ Walden contends that the superior court erred in granting DOT's motion for partial summary judgment on her claim that DOT was negligent in failing to place a curve warning sign and speed advisory plate at the Mile 54 curve.[9] But DOT was entitled to judgment as a matter of law unless Walden could establish each element of her *prima facie* negligence case. Here, she failed to establish a crucial element—the existence of a duty on DOT's part to place a curve warning sign and advisory speed plate at the subject curve.

In order to successfully resist DOT's motion for summary judgment, Walden was required to set forth specific facts showing that (1) DOT owed her a duty of care; (2) DOT breached this duty; (3) the breach was a legal cause of the accident; and (4) she suffered damages as a result.[10] Walden failed to set forth facts showing that DOT had a duty to post warning signs at the curve.

In support of its motion for summary judgment, DOT argued that it did not have a duty to place a curve warning sign and speed advisory plate at the subject curve. Alaska Statute 19.10.040 states that DOT must follow the Alaska Traffic Manual, which consists of the Manual on Uniform Traffic Control Devices (MUTCD) and the Alaska supplement.[11] According to the

2. The jury's special verdict stated that Shawn was entitled to a damage award of $6.1 million and Connie was entitled to an award of $2 million.

3. See Great Am. Ins. Co. v. Bar Club, Inc., 921 P.2d 626, 627 (Alaska 1996).

4. State, Dep't of Transp. & Pub. Facilities v. Sanders, 944 P.2d 453, 456 (Alaska 1997).

5. Sever v. Alaska Pulp Corp., 931 P.2d 354, 361 n. 11 (Alaska 1996).

6. See Yang v. Yoo, 812 P.2d 210, 217 (Alaska 1991).

7. See Bliss v. Bobich, 971 P.2d 141, 144 n. 3 (Alaska 1998).

8. See Mount Juneau Enters., Inc. v. City & Borough of Juneau, 923 P.2d 768, 773 (Alaska 1996) (reviewing decision to continue discovery under Civil Rule 56(f) for an abuse of discretion).

9. In her initial complaint, Walden alleged that DOT had a duty to post a curve warning sign and advisory speed plate prior to the section of the roadway where Mel's accident occurred.

10. See Alvey v. Pioneer Oilfield Servs., Inc., 648 P.2d 599, 600 (Alaska 1982) (citing Larman v. Kodiak Elec. Ass'n, 514 P.2d 1275, 1279 (Alaska 1973)).

11. Alaska Statute 19.10.040 provides:

[DOT] shall classify, designate, and mark highways under its jurisdiction and shall provide a

MUTCD, curve warning signs "*may* be used where engineering investigations ... show the recommended speed on the curve to be greater than 30 m.p.h. and equal to or less than the speed limit established by law or by regulation for that section of the highway." [12]

The Alaska Supplement sets out "ball bank" testing as a method for determining the recommended or safe speed on existing curves.[13] DOT expert Ken Jacobson conducted "ball bank" testing on the Mile 54 curve and concluded that it is safe to drive it at 50 m.p.h. The MUTCD provides that a curve warning sign "may" be used in situations such as the instant case, in which the recommended speed of the curve determined by "ball bank" testing, 50 m.p.h., is greater than 30 m.p.h. and less than the posted speed limit of 55 m.p.h. Because the MUTCD defines "may" as a "permissive condition" for which "no requirement for design or application is intended," [14] DOT argues that the permissive language of this MUTCD section clearly does not impose a duty upon DOT to install a curve warning sign.

Walden failed to establish facts that dispute DOT's claim and demonstrate that DOT had a duty to place a warning sign at the curve. Edward Stevens, Walden's only expert providing evidence on this issue, conducted "ball bank" testing on the Mile 54 curve and reached the same result as DOT's experts, concluding that drivers can safely enter the corner and not feel discomfort on the curve at a speed of 50 m.p.h. The posted speed limit for the section of the Parks Highway at issue is 55 m.p.h.

The Alaska Supplement states that all curve signs "*shall* be accompanied by an Advisory Speed Plate ... when the safe speed on the curve is 8 or more m.p.h. below the posted speed limit, utilizing the Safe Speed on Curves Procedures described in the supplement." [15] The MUTCD defines "shall" as a mandatory condition.[16] In the instant case, the safe speed around the curve was 50 m.p.h., only 5 m.p.h. below the posted speed. Therefore, the condition requiring an advisory plate specified in the supplement—a safe speed of 8 or more m.p.h. below the posted speed—is not met here. Since the provision sets out in certain terms when an advisory speed plate is necessary, DOT argues that it has no duty to place a speed advisory plate at a curve where the difference between the safe speed and posted speed is less than 8 m.p.h.

Because Walden's own expert concurs with DOT's expert regarding the safe speed of the curve, there is no dispute that the safe speed is 50 m.p.h. At this speed, there is no legal requirement that DOT place a curve warning sign and a speed advisory plate at the subject curve.

Because Walden cannot demonstrate that DOT had a duty to place any signs at the Mile 54 curve, she has failed to establish a necessary element of her *prima facie* negligence case. Absent any showing that DOT had a duty to post a curve warning sign and speed advisory plate at the Mile 54 curve, partial summary judgment was properly entered against Walden.

---

uniform system of marking and posting these highways. The system of marking and posting must correlate with and, as far as possible, conform to the recommendations of the Manual on Traffic Control Devices as adopted by the American Association of State Highway Officials.

The "uniform system of marking and posting" required by this statute is delineated in the Alaska Traffic Manual. At the time of Mel's accident, this manual consisted of the 1988 edition of the federal Manual on Uniform Traffic Control Devices (MUTCD) and the December 1991 Alaska supplement to the MUTCD.

**12.** American Association of State Highway Officials, *Manual on Uniform Traffic Control Devices* § 2C–5 (1988) (emphasis added).

**13.** *See* Alaska Department of Transportation, *Alaska Supplement to Manual on Uniform Traffic Control Devices* § 2C–4 to 2C–8 (December 1991).

**14.** *Manual on Uniform Traffic Control Devices* § 1A–5.

**15.** *Alaska Supplement* § 2C–4 to 2C–8 (emphasis added).

**16.** *Manual on Uniform Traffic Control Devices* at § 1A–5.

B. *The Superior Court Did Not Abuse Its Discretion by Excluding Evidence of Prior Accidents That May Have Demonstrated That DOT Had Notice of a Dangerous Condition at the Subject Curve.*

Walden argues that the trial court erred in granting DOT's motion *in limine* to preclude evidence of prior accidents at the Mile 54 curve. Because the trial court's ruling on the motion was proper and there is no evidence in the record that suggests the trial court abused its discretion, we affirm the trial court's exclusion of evidence of prior accidents.

The trial court initially ruled that Walden was precluded from introducing evidence of prior accidents unless she could demonstrate that the accidents were substantially similar to Mel's accident. The trial court stated that the relevant factors for determining substantial similarity were whether the accident occurred in the same location and under "substantially similar conditions." The trial court's ruling on the motion *in limine* comports with the law. We have held that evidence of prior or subsequent accidents is admissible in personal injury actions to demonstrate that a defective or dangerous condition existed, so long as the incident took place under substantially similar circumstances.[17]

■ Walden sought to present evidence of nine accidents that had occurred at the curve. The trial court found that two of the nine occurred under "substantially similar" circumstances—at night and in icy, snowy conditions; the court excluded evidence of the other seven accidents as irrelevant. Nothing in the record suggests that the trial court's decision to admit evidence of two and exclude evidence of the other seven accidents was an abuse of discretion.

Walden's own expert Edward Stevens, who reviewed the police reports for all nine accidents, testified that he believed only three to be substantially similar. The trial court admitted evidence of two of these accidents. Walden did not provide this court with sufficient evidence to evaluate her claim regarding the third.

■ It is well-settled that it is an appellant's responsibility to present this court with a record sufficient to allow meaningful review of his or her claims.[18] In the instant case, the only information regarding these prior accidents in the record is a table of accidents at the curve created by Walden's expert Edward Stevens and Stevens's testimony regarding the table. While the sheet does provide some important information about the accidents, such as the time they occurred and the general road conditions (dry or ice/snow), it leaves out many vital variables (such as speed, alcohol use, traveling direction of the vehicle, and weather conditions), that can make accidents that look substantially similar on paper very different in reality. Stevens compiled the table after reviewing the accident reports for each accident occurring at the curve. Without the actual accident report of the third, disputed accident, or more detailed information before us, we are not left with a "definite and firm conviction . . . that the trial court erred in its ruling" based upon the information before it.[19] Therefore, we hold that the trial court did not abuse its discretion in excluding evidence of the third accident.

C. *Walden Failed to Preserve for Appeal Her Objection to the Superior Court's Exclusion of the DOT Design Study Report.*

■ Walden contends on appeal that the superior court erred in excluding a DOT Design Study Report (DSR) that contained vital information essential to her case. We hold that Walden failed to preserve this issue.

While Walden did oppose the state's motion *in limine* to exclude the DSR, she did not object to the exclusion of the report at

17. *See Johnson v. State,* 636 P.2d 47, 57 (Alaska 1981).

18. *See Adrian v. Adrian,* 838 P.2d 808, 811 n. 5 (Alaska 1992).

19. *Bliss v. Bobich,* 971 P.2d 141, 144 n. 3 (Alaska 1998) (citation and quotation marks omitted).

trial. A review of Walden's statements at trial even indicate that she did the opposite: She agreed with the trial court's DSR ruling and explicitly stated that it was correct. During the trial, Walden's counsel admitted several times in open court that he did not dispute the trial court's ruling on the DSR. After moving for a mistrial because DOT expert Greg Frazier had testified that he had used data gathered during a 1991 survey of the curve in his analysis, Walden's counsel restated the language of the statute that formed the basis for the exclusion of the DSR and said that "we have never taken exception, in fact, I have candidly agreed with the court the case law here is legion that the Design Study Report cannot be used in a courtroom." Later that day, Walden's counsel reiterated his earlier position: "[i]f the court goes back and looks at [our] pleadings on the issue, we never responded by saying 'no judge, you can't keep out the design study report'—in fact we agreed." Moments later, Walden's counsel explicitly stated "it's not going to be an issue on appeal that the court improperly excluded the design study report." [20]

■■■■ It is well-settled that a party must object to evidence at the time it is offered in order to preserve the issue on appeal.[21] Similarly, we have held that a party's failure to make an offer of proof on a particular piece of evidence also acts as a waiver to any claim of error.[22]

In the instant case, Walden did not object to the DSR at trial. She also failed to make any offers of proof regarding the DSR. Rather, she expressed her agreement with the court's ruling, accepted it as correct, and explicitly stated that the DSR ruling would not be an issue on appeal.

In effect, Walden's statements expressly conceding that the trial court's ruling was correct, coupled with her failure to object to the DSR ruling and her failure to make an offer of proof on the DSR at trial, constitute a representation that she no longer considered the DSR ruling at issue. Because Walden's affirmative representations to the court effectively waived her objection to the trial court's exclusion of the DSR, she has waived the issue and cannot now challenge the ruling on appeal.

■■■■ Even if Walden had not waived this issue, we would affirm nonetheless because the superior court did not err in excluding the DSR. The superior court excluded the DSR on the basis of 23 U.S.C.A. § 409, which explicitly states that reports made for the purpose of planning safety enhancements for or developing "any highway safety construction improvement project" which may be implemented using federal highway funds cannot be subject to discovery or admitted in any state or federal action for damages arising from an accident occurring at a locale mentioned in the report.[23] Walden conceded that the DSR is the type of report covered by the statute, but challenged the superior court's decision to exclude it on grounds that the state had waived the protection of the statute by providing it to her during discov-

---

**20.** Although Walden argues that the statements at issue were made in the limited context of a motion for mistrial, the broad scope of these statements, which effectively state that she had not objected to the trial court's ruling even at the pleadings stage, indicate that the statements referred to her view of the ruling with respect to the trial as a whole.

**21.** See *Murat v. F/V Shelikof Strait*, 793 P.2d 69, 75 (Alaska 1990).

**22.** See Alaska R. Evid. 103(a)(2) (requiring an offer of proof to preserve objection when evidence is excluded from trial); *Adamson v. University of Alaska*, 819 P.2d 886, 889–90 (Alaska 1991).

**23.** 23 U.S.C.A. § 409 (West 2000) provides:

Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data complied or collected for the purpose of identifying[,] evaluating or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 152 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.

ery. The state did provide the report in discovery, but Walden's argument nonetheless fails because, at most, by that action DOT waived only the protection of the statute with respect to discovery, not to its admission in court. The statute provides that materials like the DSR "shall not be subject to discovery *or* admitted into evidence in a Federal or State court proceeding." [24] DOT timely objected to use of the report at trial. The trial court ruled on the DSR at the same time it ruled on all of the other items contained in both parties' motions *in limine.* Because DOT timely objected to use of the DSR at trial, it is clear that DOT did not waive the protection of the federal statute with respect to admissibility of the DSR at trial. Accordingly, the superior court did not abuse its discretion in excluding this report on federal law grounds.

D. *The Trial Court Did Not Err in Refusing to Take Steps to Mitigate the Alleged Harm to Walden's Case Caused by the Exclusion of the DSR.*

Walden further argues that the trial court should have taken steps to mitigate the damage to her case resulting from its last-minute exclusion of the DSR. She contends that the trial court erred in refusing to reopen discovery during trial, limit the state's expert testimony, and give jury instructions stating that DOT had notice of problems with the curve prior to Mel's accident.

We note at the outset that Walden has provided no authority for the proposition that a trial court is under an obligation to "mitigate" the effects of its non-erroneous ruling. Turning to Walden's specific complaints, we conclude that each lacks merit for the following additional reasons.

■ At the time Walden asked the court to reopen discovery, extensive discovery had already taken place during a period of over

one year. Because the parties had ample opportunity to engage in discovery prior to trial, the superior court did not abuse its discretion in refusing to reopen discovery during the trial. [25]

■ As to the claim that the court should have limited the state's expert testimony, the trial court did not abuse its discretion in declining to do so. Indeed, it arguably would have been an abuse of discretion for the trial court to strike the state's experts to "mitigate" the effect of its proper ruling that federal law precluded the use of the DSR. The state was fully entitled to present expert opinion as to the circumstances of the accident.

■ Finally, we find no error with regard to the court's refusal to instruct the jury that DOT had notice of problems with the curve before the accident. First, with limited exceptions not applicable here, instructions concern "matters of law ... necessary for [the jury's] information in giving [its] verdict," [26] not factual matters. Second, if Walden wished to establish as fact that DOT had notice of problems with the curve, it was incumbent upon her to adduce admissible evidence to support that proposition. That the superior court properly excluded evidence in the DSR report did not create any responsibility for the court to "mitigate" the effect of this action by instructing the jury on a matter of contested fact. Accordingly, we find no error here.

E. *The Superior Court Did Not Abuse Its Discretion in Admitting the Testimony of DOT's Expert Myers.*

Walden argues that the superior court abused its discretion in admitting evidence of skid testing conducted by DOT accident reconstruction expert John Myers because his

---

24. *Id.* (emphasis added).

25. We do not suggest that the superior court lacked the equitable authority to provide relief for any perceived disadvantage to Walden in learning shortly before trial that evidence she planned to rely on was inadmissible as a result of federal law. The court had such authority. *See Hecht Co. v. Bowles,* 321 U.S. 321, 329–30, 64 S.Ct. 587, 88 L.Ed. 754 (1944) (holding trial

courts have equitable authority to "mould each decree to the necessities of the particular case" and to allow for "nice adjustment and reconciliation between the public interest and private needs"). But the court was not required to take any particular action in this case.

26. Alaska R. Civ. P. 51(b).

tests took place under conditions different from those at the time of the Walden accident. Walden further argues that the court abused its discretion by admitting Myers's testimony about Mel Walden's driving speed at the time of the accident. We disagree.

### 1. *The superior court did not err in admitting Myers's tests.*

Walden claims that Myers's skid-testing results should have been excluded because he conducted them on packed snow rather than on an icy surface.

 While we have stated that "[e]xperimental evidence is admissible only if the conditions of the experiment were substantially similar to the conditions at the time of the event in issue,"[27] we have also recognized that similarity of conditions is not required in the case of "experiments designed to show the general traits and capacities of materials involved in the controversy."[28] As noted in *McCormick on Evidence,* "experiments showing general properties of materials are admitted without confining the experiments to the conditions surrounding the litigated situation."[29]

 The general properties of Willow sand are a major issue in the instant case. Because a purpose of Myers's experiment was to demonstrate the "traits and capacities" of Willow sand—namely, the effect of Willow sand on the coefficient of friction of the road—the test conditions need not be identical to the conditions of Mel's accident.

At the same time, Myers's test *was* carefully conducted, and it tended to show how Willow sand affected the coefficient of friction of the road. Accordingly, the test was

relevant to a contested issue in the case. Myers took great pains to ensure that the test was as accurate and informative as possible. He chose an asphalt road (the same material as the Parks Highway) for the skid testing. Because he wanted to assess the effect of Willow sand on the braking capacity of a Hyundai operated in slippery conditions (as were the conditions at the time of the accident), he chose an asphalt road that was covered with snow, which he had bladed to smooth by the highway department.[30] He used a Hyundai Excel of the same model year as the one Mel was driving, weighted the test vehicle in the same manner as Mel's car, outfitted the test vehicle with tires similar to Mel's, and conducted the test at speeds of 45–50 m.p.h. (Mel's claimed speed). He first conducted locked wheel braking tests on the smooth, packed snow surface without any sand. Myers then employed the same operator who applied the sand to the Parks Highway on the day of the accident to spread the sand on the slippery test road. In all of these aspects, the test appeared to sufficiently replicate the road conditions at the time of the accident in order to determine whether application of Willow sand would have had any effect on the braking capabilities of Mel's car. The trial court did not abuse its discretion in admitting the results of Myers's experiment.

### 2. *The superior court did not err in admitting Myers's testimony regarding Mel Walden's driving speed.*

 Walden also objects to the trial court's refusal to strike Myers's testimony that Mel Walden could have been going as fast as 63 m.p.h. as he entered the curve. Walden argues that Myers, by his own ad-

---

**27.** *Beck v. State, Dep't of Transp. & Pub. Facilities,* 837 P.2d 105, 113 (Alaska 1992).

**28.** *Patricia R. v. Sullivan,* 631 P.2d 91, 101 (Alaska 1981). In *Patricia R.,* we affirmed the exclusion of a test designed to show how a child could have been burned by an allegedly defective heater because the test purported to be a reenactment of the accident and significant dissimilarities existed between the test and real conditions. *See id.* However, we deemed admissible evidence of the characteristics of the heater gathered from the same test, such as how high the surface temperature of the heater could get. *See*

*id.* Therefore, despite the dissimilarities between the test and actual conditions, we ruled that the characteristic evidence could be admitted as being probative of the properties of the heater. *See id.*

**29.** 1 John W. Strong et al., *McCormick on Evidence* § 202 at 724 (5th ed.1999).

**30.** Myers explained that he "purposely used a surface . . . which could be prepared and safely used and which could illustrate the effect of sand on an icy surface."

mission, had not previously expressed the opinion that Mel could have been traveling over 60 m.p.h.

The trial court's denial of the motion to strike does not amount to an abuse of discretion. At trial, Myers testified that he believed that Mel did not slow down as he entered the curve, and if Mel did, that Mel's entry speed was higher than the 45–50 m.p.h. to which Mel admits. Myers further stated that for Mel to have lost control in the manner that he did, he may have been going about 63 m.p.h. as he entered the curve and then slowed down to 50. Myers did agree with Mel's testimony that Mel's speed was between 45–50 m.p.h. after his first loss of control.

Myers's testimony during direct examination suggested two possibilities: (1) that if Mel's 45–50 m.p.h. estimate of his curve entry speed was accurate, he was in fact accelerating through the curve rather than letting up on the gas pedal; or (2) that Mel was driving close to 63 m.p.h. when he entered the curve. Myers's testimony is consistent with DOT's expert witness disclosure of Myers's testimony, which stated that Myers would testify that Mel did not reduce his speed as he entered the curve and that he would state that he believed Mel was at fault for the accident. While it is true that the disclosure did not specifically state that Myers would testify to Mel's speed, Walden was aware of Myers's conclusion that Mel was at fault.

In any event, Myers's trial testimony was not inconsistent with his deposition testimony or his earlier report and DOT's expert disclosures. In addition, regardless of whether Myers had not stated previously that he would testify that Mel was going faster than 50 m.p.h., Myers's trial testimony was not "particularly prejudicial" as Connie Walden claims. Walden could have used the deposition testimony or the earlier report to impeach Myers if she thought that he was significantly contradicting himself. Further-

more, Walden was able to rebut Myers's testimony by offering eyewitness testimony from both Mel and Clay Walden that Mel had been driving somewhere between 45 and 50 m.p.h. Walden also cannot demonstrate that Myers's testimony regarding speed suddenly prejudiced her because her own expert, Dr. John Bollard, implied that Mel was partially at fault because he was driving too fast.

Because Myers's testimony did not significantly stray from the statements he made in his report and in his deposition, the trial court did not abuse its discretion by refusing to strike Myers's statement regarding Mel Walden's alleged curve entry speed.

F. *The Superior Court Did Not Abuse Its Discretion in Admitting Evidence of Clay Walden's Psychological Condition.*

Connie Walden contends that the trial court erred by denying her motion for a protective order under Alaska Evidence Rule 403 that would have barred DOT from presenting evidence of witness Clay Walden's mental disorders.[31]

■■■ Evidence of a witness's psychiatric condition is admissible if the witness "suffered from some mental aberration rendering his observation and memory ... unreliable."[32] Here, the evidence regarding the effect that mental disorders (such as those Clay suffered) have on perception and memory could support the conclusion that Clay's capacity for accurate perception and recollection could have been impaired and that such evidence was admissible.

■■■ But even if the trial court abused its discretion in admitting this evidence, any error was harmless. In his deposition, portions of which were presented during DOT's case, Clay effectively stated that the accident was Mel's fault. Because Clay's testimony contradicts the main premise of Connie's case, any loss of Clay's credibility in the jury's eyes would tend to help rather than harm

---

**31.** Clay has been diagnosed as suffering from bipolar disorder, for which he takes the medication lithium. On the day of the accident, Mel and Shawn had picked him up from the Alaska Psychiatric Institute, where he had been receiv-

ing treatment for two to three weeks, including medication to control his symptoms.

**32.** *Bakken v. State,* 489 P.2d 120, 124 (Alaska 1971).

Connie. In addition, Connie claims that Clay's testimony was important because it supported Mel's testimony that he was driving 45–50 m.p.h. when he first lost control of the car. However, it is highly unlikely that the weight given to this statement by the jury would have made a difference in the outcome of the case in light of the comprehensive and credible testimony provided by Mel and both parties' experts as to how they believed the accident happened.

G. *The Superior Court Did Not Abuse Its Discretion in Excluding DOT's Interrogatory Answer Regarding Tests Conducted by Its Counsel.*

Walden argues that the trial court erred by excluding DOT's interrogatory answer concerning results of an informal Willow sand traction test personally conducted by a DOT attorney on the grounds that this information was protected by the work product privilege. Walden maintains that the information at issue is not covered by the privilege.

 The trial court's determination that the test results were covered by the work-product privilege is correct. The attorney work-product privilege is designed to protect the mental impressions, conclusions, and opinions of an attorney in the preparation of materials for use in litigation.[33] The United States Supreme Court has stated that "the work product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case."[34] We have set three requirements for an item to be

covered by the work product privilege: (1) the item must be "a document or other tangible thing"; (2) the item must be "prepared in anticipation of litigation"; and (3) the item must be prepared by or for the party's attorney or representative.[35] The test results provided by DOT in response to the interrogatory meet all of these criteria: the test results were tangible data, the tests were performed for the sole purpose of assisting DOT in the litigation of Walden's claim, and the tests were personally conducted by a DOT attorney.

 While it is true that the work-product privilege can be waived,[36] DOT did not waive its privilege here. In general, a privilege is waived if the holder of the privilege "intentional[ly] relinquish[es] or abandon[s] . . . a known right or privilege."[37] In this case, DOT did not relinquish or abandon its privilege because it did not voluntarily provide the test results. It asserted the privilege during discovery and when the motion to compel was heard, and only produced the test results when compelled to do so by the trial court.[38]

Since the test results are protected by the work-product privilege and DOT did not waive the privilege, the trial court did not abuse its discretion by ruling that the test results were inadmissible.

V. *CONCLUSION*

Because the superior court did not abuse its discretion in making the disputed evidentiary rulings and because the superior court properly granted DOT's motion for partial

---

33. *See McKibben v. Mohawk Oil Co., Ltd.,* 667 P.2d 1223, 1231 (Alaska 1983).

34. *United States v. Nobles,* 422 U.S. 225, 238, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975).

35. *Langdon v. Champion,* 752 P.2d 999, 1005 (Alaska 1988).

36. *See Lowery v. State,* 762 P.2d 457, 460 (Alaska App.1988).

37. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

38. When Walden initially submitted the interrogatory in question, DOT refused to answer, "assert[ing] work product privilege over all aspects

of this event." Walden then filed a motion to compel a response, which the trial court granted. In an effort to comply with the court's order, DOT provided Walden with a supplemental answer providing some details of this test. Prior to trial, Walden filed a motion for ruling on admissibility of the interrogatory at trial. The trial court ruled that the interrogatory was inadmissible because it was work product prepared by DOT's attorneys. The trial court also ruled that Walden did not demonstrate the level of prejudice necessary to compel admission of the test results as Walden herself had retained experts who had conducted similar tests on their own.

summary judgment on Walden's curve warning sign negligence claim, we AFFIRM the superior court in all respects.

EASTAUGH and BRYNER, Justices, not participating.