Joseph MURAT, Appellant,

v.

F/V SHELIKOF STRAIT; Kodiak Fisheries Co., Inc.; Andreas Arnsten, a partnership; Elizabeth F., Inc.; Jerry Botkin; F/V CHICAMIN; Clipperton, Inc.; Michael Prittle; and Mark Edwards, Appellees.

No. S-2483.

Supreme Court of Alaska.

June 15, 1990.

Robert L. Eastaugh, Delaney, Wiles, Hayes, Reitman & Brubaker, Anchorage, and Raphael Metzger, Law Offices of Raphael Metzger, Seal Beach, Cal., for appellant.

Michael J. Parise, Jonathan K. Tillinghast, Birch, Horton, Bittner & Cherot, Juneau, for appellees.

OPINION

Before MATTHEWS, C.J., and RABINOWITZ, BURKE and COMPTON, JJ.

BURKE, Justice.

This appeal arises out of an action filed by the owners and operators of a number of fishing vessels (Fishermen) seeking reimbursement for some $358,000 in bounced checks written by Pacific Pride Fisheries, Inc. (Corporation) for the purchase of king crab in 1981. The Fishermen sought judgment against the now-defunct corporation as well as its officers, directors and shareholders (including Joseph Murat, appellant herein) in their personal capacities. In January 1984, the trial court entered a judg-

ment of default against the corporation for failure to comply with the court's discovery orders. In May 1987, the court granted summary judgment against Joseph Murat and Chester Hummel, "piercing the corporate veil" and holding them personally liable for the judgment previously entered against the corporation.

Murat appeals both the default judgment entered against the corporation and the judgment piercing the corporate veil. We affirm the former ruling, but reverse the latter.

## I. BACKGROUND

### A. *Facts*

In 1979, Joseph Murat, Chester Hummel, and several other individuals formed Pacific Pride Fisheries, a California general partnership (the Partnership). Murat and Hummel purchased a World War II vintage ship for $300,000, transferred it to the Partnership, and sold Partnership shares. The vessel was extensively restructured to operate as a fish processor, and was renamed the "Pacific Pride." [1]

In October 1980, Murat, Hummel and Budimer Matek formed Pacific Pride Fisheries, Inc., an Alaska corporation. Murat served as the corporation's secretary and chief financial officer, Hummel was the president, and Matek the vice president. All three constituted the board of directors. The corporation was to be funded, and shares were to be issued,[2] upon transfer of the partnership's assets to the corporation. Those assets were valued in 1981 at $1,445,000 [3] (consisting primarily of the reconstructed vessel). Legal title to the vessel was never formally transferred to the corporation, and no shares of stock were ever officially issued.[4]

---

1. The restructuring was apparently financed by a $1.4 million loan from Security Pacific National Bank; the loan was secured by a first preferred ship's mortgage on the vessel.

2. Murat, Hummel & Budimer Matek, were to receive 55% of the shares; the remainder were to be issued to the other partners, including Mario Forgiarini, David Hull, Ruth Thayer, Rex Martin & Martin Matek.

3. .This is the figure appearing on the corporation's "Application for Qualification of Securities" filed in January 1981. Murat maintains that the vessel had an actual fair market value far in excess of this amount.

4. While admitting that no stock certificates were ever "formally delivered," Murat contends that there was an agreement between the partners concerning the issuance of specific provisions of corporate stock, and that "[p]ursuant to modern

The corporation entered into an agreement with a now-defunct Minnesota corporation, Multi–Sales International [MSI], whereby MSI agreed to advance the corporation up to $600,000 "to enable [the corporation] to pay for the necessary fuel, food, labor and miscellaneous expenses required for processing operations on the Pacific Pride." Under the terms of the agreement MSI was to fund the corporation's general checking account. As security, the partnership granted MSI a junior preferred ship's mortgage against the vessel in the amount of $1 million. The agreement was ratified by the general partners, and the partnership agreed to be bound by all the duties and responsibilities imposed upon the corporation under the agreement. MSI apparently failed to perform on its obligations under the agreement, leaving the corporation with only its own assets from which to pay its operating expenses.[5]

The vessel departed Alaska in late 1981, with 90 people in its employ. In order to break even it needed to process two million pounds of king crab. However, it was only able to process one million pounds, having departed Alaska only weeks before the season was over. The vessel left the fishermen, from whom most of its crab had been purchased, with over $358,000 in bad checks drawn on the corporation's general account. The fishermen have never been paid.[6]

In the summer of 1982, Security Pacific National Bank, the holder of the first preferred ship's mortgage against the vessel, foreclosed on the vessel and purchased it at public sale for $1 million.

B. *Proceedings Below*

In February 1982, the Fisherman filed their complaint seeking a judgment against the corporation, the partnership, Murat, and the other individual partners and shareholders of the corporation for compensatory and punitive damages.

In August 1983, the Fishermen served the corporation through Mr. Findley, its attorney, with their first request for production of documents. When the corporation failed to respond, the Fishermen filed a motion to compel response. The motion to compel, like the request for production, was served on Findley.

On November 7, 1983, Findley moved to withdraw as the corporation's counsel. However, due to a clerical error, the motion, although served on the parties, was never filed with the court.

The corporation failed to respond to the Fishermen's motion to compel. On November 10, 1983, the lower court ordered the corporation to produce the requested documents and to pay the Fishermen $500 in costs. The November 10 order was served on Findley.

The Fishermen received nothing from either Findley or the corporation. Therefore, on December 7, 1983, the Fishermen moved for default judgment under Civil Rule 37(b)(2)(C) based on the corporation's wilful failure to comply with the court's November 10 order. The Fishermen served the motion for default upon Hummel and Murat, but not Findley.[7] Judge Pegues granted the motion, and the order was distributed to Murat and Hummel.

In September 1986, the corporation filed a motion to vacate the default judgment. The court denied the motion, observing that it was "as lacking in merit as any it has ever seen." The corporation has not

---

authorities, the stock ... was issued when this agreement was made."

**5.** The Fishermen contend, and the trial court concluded, that its cash assets totaled only $17,-388.74, *the amount transferred from the partnership checking account to the corporation accounts shortly after incorporation.*

**6.** The partnership dissolved in 1982. The corporation was involuntarily dissolved by the state in 1984. It had no assets at the time of its dissolution.

**7.** In the points and authorities in support of the motion for default judgment, the Fishermen stated "[t]he court has not, as yet, granted Mr. Findley's motion [to withdraw]." It appears, therefore, that they were aware that Findley had not properly withdrawn as attorney of record; they nonetheless served Hummel and Murat.

appealed the denial of its motion to vacate the default.[8]

. In August 1986, the Fishermen moved for summary judgment, requesting that the court "pierce the corporate veil" and impose personal liability upon Murat, Hummel and the other remaining individual defendants for the amount owed by the corporation. The court granted summary judgment in favor of the Fishermen.[9] The court thereafter entered final judgment against defendants jointly and severally, in the amount of $543,755.04, including costs and interest. The court certified the judgment for appeal pursuant to Civil Rule 54(b).

Murat appeals both the summary judgment piercing the corporate veil and the default judgment against the corporation for the underlying debt.

## II. DISCUSSION

### A. *The Default Judgment*

Murat contends that the summary judgment against him must be reversed because it is "predicated upon" a default judgment against the corporation which is "void" as violative of both the Alaska Rules of Civil Procedure and the due process clauses of the State and Federal Constitutions.[10] We reject Murat's contentions and affirm the default judgment against the corporation.

#### 1. Due Process

■ Murat contends that the default judgment is void because it was rendered in violation of the corporation's due process rights. He argues that the plaintiffs' failure to serve the corporation's attorney of record with notice of the motion for entry of default judgment deprived the corporation of "notice reasonably calculated, under all the circumstances, to apprise [the corporation] of the pendency of the action and afford [it] an opportunity to present [its] objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313–14, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950); *Aguchak v. Montgomery Ward Co.*, 520 P.2d 1352, 1357 (Alaska 1974). Pointing to AS 22.20.040, which provides that a corporate party "shall appear by an attorney in all cases," and to Alaska Civil Rule 5(b), which requires that service be made only upon a party's attorney in cases where a party is represented by an attorney, Murat contends that nothing short of service on Findley was adequate to satisfy the corporation's due process rights. We disagree.

The relevant consideration for these purposes is not whether the Fishermen failed to comply with the service provisions of the Alaska Civil Rules, a question we consider in greater detail below, but rather whether the corporation was adequately informed of the motion for default under the particular circumstances of this case. *Mullane*, 339 U.S. at 313, 70 S.Ct. at 656. It is undisputed that notice was served on both Hummel, the president of the corporation, and Murat, its secretary/treasurer and chief financial officer. It is also undisputed that it was these two persons who controlled this

---

**8.** The record contains no indication that the default entered against the corporation was certified as a final judgment pursuant to Civil Rule 54(b) until at least sometime in late 1987, when judgment was entered against Murat. Accordingly, it appears that the motion to vacate was interlocutory in nature, and that it became appealable only at the later date.

**9.** The court granted summary judgment in favor of the Mateks on the issue of their personal liability. The Fishermen moved for reconsideration, which the court granted. Further litigation is pending against the Mateks in the lower court.

**10.** Preliminarily, the Fishermen contend that Murat is without standing to challenge the default judgment against the corporation because (1) the judgment was entered against the corporation, not against Murat personally; and (2) the corporation's motion to vacate the default was denied and was not appealed by the corporation. We find it unnecessary to resolve the standing question in this case. As we explain further below, even assuming *arguendo* that Murat has standing to appeal the corporate default, we believe the default judgment must be affirmed on the merits. Because the corporation itself would possess no right to relief on these facts, *a fortiori*, Murat's attempt to secure relief on its behalf must fail.

Similarly, in light of our conclusion on the merits of the default judgment claim, we find it unnecessary to resolve the Fishermen's timeliness and res judicata challenges.

litigation on the corporation's behalf. Indeed, Findley, the corporation's counsel, filed an affidavit stating that "[a]ll communication with [counsel] on behalf of Pacific Pride Fisheries, Inc. [has] been through Chet Hummel or Joseph Murat." Had counsel for the corporation successfully withdrawn from representation, we think it clear that service on Murat and Hummel would have been sufficient notice to the corporation for due process purposes. *Talbot's, Inc. v. Cessnun Enterprises*, 518 P.2d 1064, 1071 (Alaska 1974) (corporation president's actual knowledge of easement dispute satisfied due process requirement as to corporation). The fact that Findley officially remained counsel of record at the time notice was served on the corporate officers does not alter our due process analysis. We conclude that the corporation was provided with notice reasonably calculated to apprise it of the impending motion for default judgment and was afforded ample opportunity to respond thereto.

### 2. Violation of the Civil Rules

■■■■ Murat observes that the Fishermen violated Civil Rules 5(e) and 55(c)(1) in serving the corporate officers directly, rather than serving Findley, the attorney of record for the corporation.[11] As a result, Murat contends, the default judgment was void and the trial court erred as a matter of law in refusing to set it aside. We reject Murat's contention.

In *Balchen v. Balchen*, 566 P.2d 1324, 1326–28 (Alaska 1977) this court expressly held that service of a motion upon a party rather than upon a party's attorney in violation of Civil Rule 5(b) does not render a resulting judgment void. In that case, we considered the validity of a judgment entered on a motion seeking payment of back child support where the motion was served directly upon the party defendant rather

than on his attorney. *Id.* at 1325–26. In affirming the lower court's denial of defendant's motion to vacate the judgment, we observed:

> Admittedly under Alaska's Rules of Civil Procedure as presently constituted, the preferred procedure is to obtain the superior court's permission prior to making service of a motion on a party personally. Nevertheless, this minor noncompliance with Civil Rule 5(b) does not require vacation of the judgment in question.

566 P.2d at 1327. *See also Case v. Winters*, 689 P.2d 467, 469 n. 5 (Alaska 1984) (service of motion on party rather than party's attorney was "a minor irregularity that does not warrant relief from judgment").

The rule of law to be drawn from *Balchen* and *Case* is that mere service on a party rather than on a party's attorney in violation of the civil rules will not render a judgment void, but will instead subject it to possible reversal based on the particular circumstances of the individual case. *Cf. Winfield Associates, Inc. v. Stonecipher*, 429 F.2d 1087, 1091 (10th Cir.1970) ("A procedural defect, such as failure to give notice [of motion for default judgment] as required, may be sufficient to afford relief from a default judgment on appeal or ... under Rule 60(b) ... however the error should not usually be treated as so serious as to render the judgment void. Such a procedural defect should be considered 'in light of surrounding circumstances and will at times be harmless.' ").

Here, as already concluded above, the corporation may be deemed to have received adequate notice of the motion through direct service on its appropriate officers and directors. At the time the motion for default judgment was filed, Findley had already moved to withdraw as

---

**11.** Alaska Civil Rule 5(b) provides that, with respect to all pleadings and papers subsequent to the original complaint, "the service shall be made upon the attorney unless service upon the party himself is ordered by the court." Alaska R.Civ.P. 55(c)(1) provides in part that:

> If the party against whom default judgment is sought has appeared in the action, that party (*or, if appearing by representative, the party's*

*representative*) shall be served with written notice of his application for judgment at least three days prior to a decision on the application.

(emphasis added).

It appears clear from the record, and it is not seriously disputed herein that the Fishermen are in technical noncompliance with these rules.

counsel for the corporation. Although that motion had not yet been granted, there is no evidence that the corporation was prejudiced by the failure to serve Findley directly. It appears highly unlikely that Findley, even if he had been served, would have taken any action whatsoever, except perhaps to forward the notice to Murat and Hummel. Indeed, Findley had repeatedly failed to take any action on the earlier discovery requests, despite undisputed service of those requests on him.

The question whether to set aside the default judgment based on the Rule 5(b) violation was one for the sound discretion of the trial court. *See* Alaska R.Civ.P. 55(c); *Gregor v. Hodges*, 612 P.2d 1008, 1010 (Alaska 1980). We cannot say the trial court abused its discretion in denying relief on these facts. The default judgment entered against the corporation is affirmed.[12]

## B. *The Summary Judgment*

Murat raises three primary claims of error in connection with the trial court's order granting summary judgment imposing personal liability upon Murat on a corporate "piercing" theory. We discuss each in turn below.

### 1. Notice

■ Murat's first objection is that the Fishermen's pleadings were inadequate to inform him that personal liability was sought on the corporate debt. We reject the contention as meritless.

Alaska Rule of Civil Procedure 8(a) requires only that the complaint contain "information from which a court could conclude ... [that] a valid claim was alleged 'showing that the pleader is entitled to relief.' " *Schaible v. Fairbanks Medical & Surgical Clinic, Inc.*, 531 P.2d 1252, 1256 (Alaska 1975) (quoting *Dworkin v. First Nat'l Bank of Fairbanks*, 444 P.2d 777, 778 (Alaska 1968)). The complaint in this case named Murat as an individual defendant, in his capacity both as a general partner of Pacific Pride, and as a shareholder of Pacific Pride Fisheries, Inc. The complaint alleged that the defendants fraudulently represented that sufficient funds were available to pay for the crab delivered to the ship; that the defendants failed to honor the checks even though the plaintiffs have made a demand; and that the tender of the "insufficient funds" checks constituted a breach of contract. The prayer for relief requested judgment jointly and severally against each of the defendants. Notably, in Murat's answer to the complaint, he specifically disputes his personal liability, asserting a corporate shield defense.[13] We are satisfied that Murat was adequately informed of the possibility that he may be held personally liable for the corporate debt.

### 2. Evidentiary Objections

■ The Fishermen appended 28 documentary exhibits to their motion for summary judgment. No effort was made to authenticate these documents, and no affidavits were filed in support of the motion. Murat timely objected to the court's consideration of the unauthenticated documents, based on the requirement of Civil Rule 56(e) that summary judgments be supported only by admissible evidence. *See Brock v. Rogers & Babler, Inc.*, 536 P.2d

---

**12.** Murat also argues that default judgment must be set aside because it was entered in violation of Civil Rule 55(c)(4), which provides in pertinent part:

 If the case involves multiple defendants and all defendants have not been defaulted, the court may not enter a default judgment unless the non-defaulting defendant's defenses would not be available to the defaulting defendant. We initially requested supplemental briefing on the question whether Rule 55(c)(4), which was adopted after the default was entered in the case at bar, applied retroactively to this case. However, we are now persuaded by the Fishermen's argument that the Rule 55(c) claim was effectively waived by Murat when he failed to raise it either in the proceedings below or in his points on appeal. *See Oceanview Homeowners Ass'n v. Quadrant Construction*, 680 P.2d 793, 797 (Alaska 1984); *Williams v. Alyeska Pipeline Service*, 650 P.2d 343, 351 (Alaska 1982).

**13.** Murat's "Fourth Affirmative Defense" stated that "[a]ll actions described in Plaintiff's Complaint ... are actions undertaken by Defendant Pacific Pride Fisheries, Inc. and not Defendant Joseph Murat ... in an individual capacity."

778, 782 (Alaska 1975); *see also* Alaska R.Evid. 901 ("evidence sufficient to support a finding that the matter in question is what its proponent claims" is a "condition precedent to admissibility").

The court rejected the evidentiary objection, concluding that "[t]his court may properly consider unauthenticated documents submitted as exhibits as long as the opposing party does not object to the authenticity of the documents," citing *Kvasnikoff v. Weaver Bros., Inc.*, 405 P.2d 781, 784 (Alaska 1965). It was apparently the court's ruling, and it is the Fishermen's position on appeal, that it is not enough for an opposing party to timely object to proffered evidence on the ground that it is not *authenticated,* the party must also raise some doubt as to whether the documentary evidence is in fact *authentic.* Murat contends that the trial court erred in so ruling. We agree.

*Kvasnikoff,* the case upon which the court relied in reaching its conclusion, does not hold that a specific objection to the authenticity of a document is required where an otherwise timely objection to the authentication requirement is made. In *Kvasnikoff,* the court held that a moving party's affidavit was insufficient to properly authenticate the documents attached to it. It went on to conclude, however, that "the record does not show that *the affidavit was objected to* or that the authenticity of the [documents] was disputed by appellee," and thus the trial court could properly consider the evidence. *Id.* at 784. *Kvasnikoff* has repeatedly been cited by this court for the well-recognized principle that a fail-

ure to timely raise any evidentiary objection constitutes waiver of that objection and permits the court to consider the proffered evidence.[14] *See, e.g., Turnbull v. LaRose,* 702 P.2d 1331, 1335 (Alaska 1985); *Kodiak Island Borough v. Large,* 622 P.2d 440, 447 (Alaska 1981). However, the Fishermen cite no case in which we have held that the authentication requirement may be dispensed with where, as here, a timely objection based on Evidence Rule 901 is made, but no specific challenge is made to the genuineness of any particular document.[15]

Evidence Rule 901 provides that authentication is a "condition precedent to admissibility." Were this court to accept the Fishermen's proposed rule, it would effectively shift the burden to the non-proffering party to show a lack of actual authenticity. That is, it would transform a mandatory foundational requirement into a presumption of authenticity, subject only to *disproof* by the non-proferring party. Such an interpretation would be contrary to the language of Evidence Rule 901 and the well-recognized rule that the burden of proving the authenticity of documentary evidence falls upon the party proffering such evidence. *See Continental Baking Co. v. Katz,* 68 Cal.2d 512, 67 Cal.Rptr. 761, 769, 439 P.2d 889, 897 (1968) ("We understand that in some legal systems it is assumed that documents are what they purport to be, unless shown to be otherwise. With us it is the other way around. Generally speaking, documents must be authenticated in some·fashion before they are admissible in evidence."). We think that Murat was required to do no more than raise a

---

**14.** And, indeed, it is this principle which is recited in the case upon which *Kvasnikoff* expressly relied. *See Mitchell v. Dooley Bros., Inc.,* 286 F.2d 40, 42 (1st Cir.1960), *cert. denied,* 366 U.S. 911, 81 S.Ct. 1086, 6 L.Ed.2d 236 (1961).

**15.** In addition to *Kvasnikoff,* the Fishermen cite *Walker v. White,* 618 P.2d 561 (Alaska 1980) and *Concerned Citizens of So. Kenai Pen. v. Kenai Pen. Borough,* 527 P.2d 447 (Alaska 1974). Neither case is controlling here. In *Concerned Citizens,* the court held harmless a trial court's taking of *judicial notice* of a city ordinance and a supreme court order without first notifying the parties of its intent to do so pursuant to former Civil Rule 43. 527 P.2d at 450–51. In so

doing, the court noted appellants' failure to challenge the genuineness of the photocopied government documents. *Id.* That holding, however, was not based upon a party's compliance or noncompliance with the authentication requirements of Evidence Rule 901. Similarly, this court's holding in *Walker* is not dispositive. There, the court held that documents *on file with the court* in connection with a party's response to production of documents could be examined by the court upon summary judgment. 618 P.2d at 563. There is no mention of the authentication requirement in that case, and it is unclear what specific evidentiary objection was made therein.

timely objection based on the authentication requirement in order to preserve his evidentiary objection and compel compliance by the Fishermen.[16]

In this case, however, the error may have been harmless. The trial court observed that "many or most of the exhibits submitted by plaintiffs were also submitted by defendant Murat." While this may be true, we find it unnecessary to engage in a document-by-document analysis of the Fishermen's evidence herein to determine admissibility under a theory of harmless error. As we explain below, even assuming the admissibility of the Fishermen's documentary evidence, we believe that Murat's authenticated documentation was itself sufficient to raise a triable issue as to the corporate "piercing" claim, thus precluding summary judgment.

### 3. Genuine Issue of Material Fact

Murat contends that the court erred in concluding that no genuine issue of material fact exists concerning Murat's personal liability for the corporate debts.

 As the trial court recognized, in Alaska, the primary consideration in determining whether to "pierce the corporate veil" is whether the corporate form has been abused by the person sought to be charged; that is, whether the corporate entity was used "to defeat public convenience, justify wrong, commit fraud or defend crime." *Eagle Air, Inc. v. Corroon & Black/Dawson & Co., Inc.,* 648 P.2d 1000, 1004 (Alaska 1982) (quoting *General Constr. Co. v. Tyonek Timber, Inc.,* 629

P.2d 981, 983 (Alaska 1981)). In determining whether there has been an abuse of the corporate form sufficient to justify a disregard of the protective "veil" in the shareholder-corporation context, this court has approved a "quantitative approach," under which the following factors are to be considered by the court:

(a) whether the shareholder sought to be charged owns all or most of the stock of the corporation; (b) whether the shareholder has subscribed to all of the capital stock of the corporation or otherwise caused its incorporation; (c) whether the corporation has grossly inadequate capital; (d) whether the shareholder uses the property of the corporation as his own; (e) whether the directors or executives of the corporation act independently in the interest of the corporation or simply take their orders from the shareholder in the latter's interest; (f) whether the formal legal requirements of the corporation are observed.

*Uchitel Co. v. Telephone Co.,* 646 P.2d 229, 235 (Alaska 1982).

In the instant case, the court, applying the quantitative analysis to the undisputed facts herein, determined that disregard of the corporate entity was appropriate. Accordingly, it granted summary judgment against Murat. Murat asserts that the trial court erred in so doing, and that the record demonstrates that there remain genuine issues of material fact concerning Murat's personal liability. We agree.

First, although the trial court states in its memorandum decision that "a number

---

**16.** We note that the federal courts have never embraced a rule similar to the one suggested by the Fishermen herein. On the contrary, they have tended to treat the authentication rule with some rigidity. In *Canada v. Blain's Helicopters, Inc.,* 831 F.2d 920, 925 (9th Cir.1987), for example, the Ninth Circuit Court of Appeals observed:

> It is well settled that unauthenticated documents cannot be considered on a motion for summary judgment. In order to be considered by the court, "documents must be authenticated by and attached to an affidavit that meets the requirements of [Fed.R.Civ.P.] 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence."

10A C. Wright, A. Miller & M. Kane, *Federal*

*Practice and Procedure* § 2722 at 58–60 (2d ed.1983) (footnotes omitted). This court has consistently held that documents which have not had a proper foundation laid to authenticate them cannot support a motion for summary judgment. We hold that such documents may not be relied upon to defeat a motion for summary judgment.
(emphasis added; citations omitted). *Accord Presley v. Carribean Seal,* 537 F.Supp. 956, 965 (S.D.Tex.1982) ("*While there is probably no serious dispute as to the document's authenticity or the effect of its provisions, it is nonetheless not admissible as evidence* [on summary judgment] absent proper authentication or identification." (emphasis added)). *See also Nolla Morell v. Riefkohl,* 651 F.Supp. 134, 140 (D.P.R.1986).

of the *Uchitel* factors are clearly present" in this case, the fact is that the court found that only two were present: causation of incorporation by the shareholders and grossly inadequate capitalization. The court expressly found, on the undisputed evidence, that the remaining four factors were *not* present.

As to the two factors identified, we are satisfied the trial court was correct in determining that there is no genuine issue of material fact that Murat, at least in conjunction with Hummel and Matek, "caused the incorporation" of the former partnership.[17] However, since this factor is likely to be present in almost all "piercing" cases involving small corporations, we do not find it so persuasive as to justify judgment against a shareholder/defendant as a matter of law.

The capitalization issue is more problematic. While conceding that legal title to the vessel "Pacific Pride" was never transferred from the partnership to the corporation, Murat contends that there is a triable issue as to (1) whether "equitable title" had in fact vested in the corporation at the time the corporation began its operations, and (2) whether the ship had a sufficient fair market value to constitute adequate capitalization of the corporation.

"Equitable title" has been described as the right "in the party to whom title belongs to have the legal title transferred to him upon the performance of [a] specified condition." *Reinhold v. Fee Fee Trunk Sewer, Inc.,* 664 S.W.2d 599, 603 (Mo.App. 1984), *cert. denied,* 469 U.S. 832, 105 S.Ct. 121, 83 L.Ed.2d 63 (1984); *see also Citizens Nat'l Bank of Kirksville v. Commissioner,* 122 F.2d 1011, 1014 (8th Cir.1941), *cert. denied,* 315 U.S. 822, 62 S.Ct. 913, 86 L.Ed. 1219 (1942). Courts have recognized that where an association or partnership incorporates, the assets of the former do not *ipso facto* transfer to the latter; however, the corporation, even without legal conveyance, may acquire equitable title to a partnership asset. *Maron v. Howard,* 258 Cal. App.2d 473, 66 Cal.Rptr. 70, 77 (1968); *see*

*also Henry Walker Park Ass'n v. Mathews,* 249 Iowa 1246, 91 N.W.2d 703, 706 (1958) ("when a corporation is formed to take over the property of a voluntary association no conveyance is necessary, if the action is taken by unanimous consent of . . . the association"); *Hochadel v. G & H Enterprises,* 16 A.D.2d 874, 228 N.Y.S.2d 479, 480 (1962) (where partnership incorporated and agreed to transfer realty to corporation in exchange for shares of corporation, equitable title vested in corporation upon issuance of shares though no deed was ever executed); 8 Fletcher, *Cyclopedia of the Law of Private Corporations,* § 4006, at 322–23 (1983) ("while a contract or agreement between the members of a firm to transfer the . . . property of the firm to the corporation may not, under the circumstances, vest a present legal title in the corporation, it may vest in it an equity to have the property, and a right to have the contract or agreement specifically enforced").

In his opposition to the Fishermen's motion for summary judgment, Murat presented, among other things, an authenticated copy of a resolution adopted by the corporation in August 1981, which provides, *inter alia,* that *"in consideration of the transfer to the Corporation of the assets of said Partnership, this Corporation hereby assumes all liabilities of said Partnership* in existence as of July 31, 1981 . . . [T]he officers of this Corporation are hereby authorized and directed to take any and all actions necessary in order to complete the assumption of liabilities of said partnership," (emphasis added). He also provides an agreement entitled "First Amendment to Preferred Mortgage," which was executed between the corporation, the partnership, and Security Pacific National Bank. The agreement, which is signed by all partners and corporate officers, provides in part: "on or about September 21, 1981 Borrower assumed the liabilities of Partnership to Bank. . . . *Borrower has acquired or will acquire the assets of Partnership, including the Vessel."*

17. Murat admits that the three were the "original incorporators" of Pacific Pride Fisheries, Inc. He simply claims that he *alone* did not cause incorporation.

As additional evidence tending to demonstrate that the corporation had acquired equitable title to the vessel, Murat offers a letter addressed to Security Pacific National Bank, the holder of the first preferred ship's mortgage on the "Pacific Pride." The letter, dated December 15, 1981, is signed by Murat and Hummel on the corporation's behalf and provides in pertinent part as follows:

> Borrower [the corporation] has executed and delivered to Bank a Demand Note dated September 21, 1980 (the "Demand Note") in the principal amount of $1,200,000. *The Demand Note evidences Borrower's assumption of the liabilities of Partnership to Bank as evidenced by a Promissory Note dated June 20, 1980 in the principal amount of $1,400,000 (the "Partnership Note"). Borrower has assumed those liabilities to Bank in connection with the transfer of Partnership's assets to Borrower. One of those assets is the Vessel PACIFIC PRIDE* (Official Number 621200), including its related engines, furnishings, fixtures, fittings and equipment (hereinafter referred to collectively as the "Vessel"). The Vessel is subject to first preferred ship mortgage in favor of the Bank from Partnership dated June 20, 1980 (the "Mortgage").

> *Borrower is now completing the documentation necessary to transfer the Vessel from Partnership to Borrower.* In connection therewith, Borrower has requested that Bank consent to the transfer of the Vessel and the surrender of its marine documents. *In consideration for such consent, Borrower hereby confirms that it has assumed liability to Bank for payment of the indebtedness of the partnership to Bank,* including, but not limited to, all liabilities of Partnership under the Partnership Note and the Mortgage.

(emphasis added).

■ Construing all reasonable inferences from these documents in favor of Murat, as we must when reviewing an order granting summary judgment, we conclude that they raise a triable issue of fact as to whether equitable title to the vessel passed to the corporation at or about the time the foregoing documents were executed.[18] It is at least arguable that the corporation, at the point it assumed the partnership liabilities "in consideration of" transfer of the corporate assets, became vested with "the right to have legal title transferred to [it]." If so, there would appear to be a genuine issue as to the adequacy of the capitalization.[19] *See generally* 8 *Fletcher, supra* § 4006, at 322 ("the circumstances and agreements attending the incorporation and the instruments, contracts, and conveyances made in perfecting it will determine the title or interest of a corporation formed by partners. . . . It is important, in this connection, to know . . . whether the corporation contemplated and, in fact, effected a vesting of such title or interest in the corporation.").

Moreover, we observe that, even if capitalization were not to be considered in serious dispute, it remains the general rule that inadequate capitalization, while an important factor, is not alone sufficient to justify piercing the corporate veil. *See* 1 *Fletcher, supra* § 44.1; *see also Fisser v. International Bank*, 282 F.2d 231, 240 (2d Cir.1960) ("we are pointed to no authorities which justify disregard of a corporation's separate existence merely because of its undercapitalization when its controlling stockholder has at least regarded the formalities of such existence"); *accord Eagle*

---

18. In concluding that there was "no basis" for Murat's assertion regarding equitable title, the court looked to an affidavit by Matek stating that "no decision to transfer the ship" was made by the partnership in 1981. To the extent this statement conflicts with Murat's evidence, it merely creates an issue for resolution by the trier of fact.

19. The trial court, in suggesting that there would be no triable issue of fact concerning capitalization "even had the vessel been a corporate asset" was incorrect. Analyzing the unauthenticated corporate financial statements, which listed the value of the vessel at $3.3 million, the court observed that the corporation was still in the red. However, the court apparently failed to consider an affidavit introduced by Murat, which was prepared by a marine surveyor who appraised the vessel in 1980, attributing it a fair market value of $7.75 million.

*Transport, Ltd. v. O'Connor*, 470 F.Supp. 731, 733–34 (S.D.N.Y.1979) ($1,000 capitalization for corporation committing itself to pay more than 1 million dollars over five-month period was grossly inadequate, but insufficient on facts to justify piercing corporate veil).[20]

In light of the foregoing, we conclude that Murat has adequately demonstrated that the question whether the corporation in the instant case can fairly be said to be one which was formed "to defeat public convenience, justify wrong, commit fraud, or defend crime," or one which functioned as the mere "alter ego" of Murat himself, is a question for the trier of fact, which should not have been determined on summary judgment.[21]

## IV. CONCLUSION

The default judgment entered against Pacific Pride Fisheries, Inc. is AFFIRMED. The summary judgment entered against Murat in his personal capacity is REVERSED and REMANDED for further proceedings consistent with this opinion.

MOORE, J., not participating.

---

**20.** We note with interest, however, that a number of commentators, and a few courts, have suggested that grossly inadequate capitalization should be considered a separate and independent basis for "piercing the corporate veil," rather than simply one factor in a multi-factor test. *See generally* Hackney & Benson, *Shareholder Liability for Inadequate Capital*, 43 U.Pitt.L.Rev. 837, 883–90 (1982); Note, *Inadequate Capitalization As a Basis for Shareholder Liability: The California Approach and a Recommendation*, 45 S.Cal.L.Rev. 823, 830–36 (1972); Note, *Limited Liability: A Definitive Judicial Standard for the Inadequate Capitalization Problem*, 47 Temp. L.Q. 321, 338–51 (1974). We need not definitively answer this question here, as we conclude Murat has presented a triable issue on the capitalization question, and the Fishermen have failed to demonstrate so compelling a case under the remaining factors of the *Uchitel* "alter ego" test as to justify entry of judgment as a matter of law. *Cf. McKibben v. Mohawk Oil Co.*, 667 P.2d 1223, 1230 (Alaska 1983) (summary judgment on "mere instrumentality" issue appropriate where virtually every factor was indicated on the undisputed evidence).

**21.** Murat has also suggested that "piercing" is precluded as a matter of law because (1) the corporation was issued a certificate of incorporation under AS 10.05.261 and (2) the checks at issue "[were] drawn in the name of [the corporation]," thus putting the Fishermen on notice of the corporate status. The contentions are without merit. This court has never held that such factors preclude disregard of the corporate entity under the *Uchitel* test.