NEROX POWER SYSTEMS, INC.; Nerox Energy Corporation, a/k/a E*Two Media.Com; William D. Artus; Coal Factors, Inc.; The LKL Trust; John Wallace, Trustee for the Wallace M.D. Family Trust; Gretchen A. Ross, Trustee for the G.A.R. Trust; and Nicholas E. Ross, Appellants,

v.

M–B CONTRACTING COMPANY, INC.; Tope Equipment Company; Alaska Law Offices, Inc.; and Steven Jones, Appellees.

No. S–9922.

Supreme Court of Alaska.

Sept. 13, 2002.

William L. Choquette, Choquette & Farleigh, LLC, Anchorage, for Appellants.

Robert J. Dickson, Atkinson, Conway & Gagnon, Anchorage, for Appellee M-B Contracting Company, Inc.

Gary Spraker, Bundy & Christianson, Anchorage, for Appellee Tope Equipment Company.

Don C. Bauermeister, Burke & Bauermeister, PLLC, Anchorage, for Appellees Alaska Law Offices and Steven Jones.

Before: FABE, Chief Justice, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

In April 1997 Nerox Power Systems, Inc. recorded two deeds of trust encumbering mining rights to the Jonesville coal mine in Sutton, for the purpose of securing repayment of debts to certain alleged creditors. At issue in this appeal is the superior court's decision to give other creditors lien priority over the deeds of trust under the doctrine of equitable subordination. A second issue concerning the legal relationship between Nerox Power, its parent company, and the major

shareholder in the parent company is which of these should assume liability for the debts of Nerox Power. The superior court pierced the corporate veil of the parent company to make its major shareholder liable for the debts of Nerox Power. We affirm the decision of the superior court in all respects.

## II. FACTS AND PROCEEDINGS

Gemini Capital Corporation was incorporated in Nevada in 1985, and its stock was publicly traded. The corporation held interests in various gas and oil wells and based its profits on royalties from its holdings. By April 1991 Gemini Capital Corporation had run into financial difficulties, and its stock was de-listed due to valuation uncertainties. The company remained dormant for the next several months and in 1992 changed its name to Gemini Energy Corporation. Gemini Operating Company, a subsidiary of Gemini Capital Corporation (later Gemini Energy Corporation), was incorporated in 1990.

In November 1992 Nicholas E. Ross obtained a controlling interest in Gemini Energy Corporation; the corporation changed its name to Nerox Energy Corporation in 1994. Ross served as the president and chief executive officer of Nerox Energy from the time of purchase until November 1997. In 1994 Ross sought to acquire a five percent interest in a Cook Inlet oil field owned by Stewart Petroleum. In order to raise the necessary capital, Ross issued 108,394 shares of common stock in Nerox Energy. Because Nerox Energy was facing financial difficulties at the time, Ross attracted investors by promising that by 1996 Nerox Energy's stock would reach $35.71, for a total valuation of $3.87 million, and that any difference would be paid either in cash or additional stock if this goal was not reached.[1] Stewart Petroleum went bankrupt in 1996, depriving Nerox Energy of its expected profit.

In 1995 Ross decided to expand into coal mining through the subsidiary Gemini Oper-

ating Company, which he renamed Nerox Power Systems, Inc. Nerox Power acquired the Jonesville coal mine in Sutton, which was not operational at the time of acquisition. The mining rights were previously owned by Hobbs Industries, Inc. under a sublease with Placer Dome U.S., Inc. Hobbs assigned its rights to Nerox Power on August 10, 1995 in exchange for stock in Nerox Power and other consideration. In late October 1995 Nerox Power purchased the mining rights from Placer Dome for $1 million, $800,000 of which was paid in cash and the balance executed in a promissory note. Of the $800,000 paid in cash, $400,000 was contributed by the GAR Trust and the Ross Family Trust, while the other $400,000 was raised by the sale of preferred stock to a set of investors.[2] The mining rights to the Jonesville mine were the only asset Nerox Power ever owned.

The Jonesville mine was not successful, and Nerox Power never generated any revenue from the sale of coal. Ross himself personally loaned approximately $1.8 million to Nerox Power and Nerox Energy to cover operating and development costs for the mine. In September 1996 Nerox Power leased heavy equipment from both M–B Contracting, Inc. and Tope Equipment Company for use at the mine. Out of frustration over Nerox Power's financial difficulties, Ross fired its existing president in December 1996 and replaced him with William Artus, who had been serving as legal counsel for Nerox Energy. Shortly after being hired, Artus loaned $79,500 to Nerox Power to cover operating expenses and a portion of the remaining $200,000 it owed to Placer Dome. Artus was also owed a little over $68,000 for legal services he provided to Nerox Energy prior to becoming president of Nerox Power. Nerox Energy issued Artus 151,016 shares of stock in 1997 but did not specify for which debt the stock was issued or how much of the debt was relieved by the issuance. Nerox Power recorded a deed of trust against the Jonesville mine on April 11, 1997 to secure a

---

1. An earlier financial statement also lists $3.87 million of expected stock value but claims that the promised value of each share was only one dollar, implying that 3.87 million shares were issued. The number of shares issued is less important than the amount of debt incurred by Nerox as a result.

2. The exact number of investors is disputed and will be addressed in the later discussion of the April 21, 1997 deed of trust.

payment of $191,576 to Artus and Coal Factors, Inc., which had supplied plans, materials, and equipment for a coal washing plant.

Ross purchased Nerox Power in 1998 for $10,000 and the assumption of all corporate debt. Ross also transferred control of Nerox Energy to outside investors as part of the same transaction. Nerox Energy was renamed E*two Media.com.

M–B recorded a lien against Nerox Power and Nerox Energy on May 14, 1997 and a lien extension on October 27, 1998. Tope recorded a similar lien on May 22, 1997 and a lien extension on November 19, 1997. Nerox Energy stipulated to a judgment of $47,500 in outstanding legal expenses to Alaska Law Offices and Steven Jones on August 28, 1997 for services rendered with regard to continuing litigation between Nerox Power and Hobbs Industries.

On April 10, 1998, M–B filed to foreclose on its mechanic's lien and hold Nerox Energy liable for Nerox Power's debt. Tope cross-claimed and counter-claimed to foreclose on its mechanic's lien, and Alaska Law Offices and Steven Jones later moved to foreclose on its judgment lien. As a sanction for failing to comply with a discovery order, the superior court held that Nerox Energy was the alter ego of Nerox Power. Following a May 2000 trial, Superior Court Judge Karen L. Hunt concluded, based on extensive factual findings: that M–B and Tope could foreclose on their mechanic's liens and that Alaska Law Offices and Steven Jones could foreclose on their judgment lien; that the two April 1997 deeds of trust were subordinated to the mechanic's and judgment liens; and that both Nerox Power and Nerox Energy were instrumentalities of Ross, thus "piercing" the corporate veil and making Ross liable for their debts. Ross, Artus, Nerox Power, Nerox Energy, and other investors in Nerox Energy appeal this decision.

## III. DISCUSSION

■ There are two main issues in this case: (1) whether the two April 1997 deeds of trust can be equitably subordinated to the liens of M–B, Tope, and Alaska Law Offices;[3] and (2) whether Ross is personally liable for the debts of Nerox Power and Nerox Energy. The primary factual question raised by both issues is whether Ross and Artus acted fraudulently in their handling of the financial affairs for Nerox Energy and Nerox Power. Judge Hunt found sufficient evidence to conclude that fraud existed. To this finding we apply the "clearly erroneous" standard of review.[4] A finding of fact is clearly erroneous "if it leaves this court with a 'definite and firm conviction on the entire record that a mistake has been made.' "[5] This standard, therefore, requires us to give great deference to the findings of the superior court.[6] Judge Hunt further concluded that the deeds of trust should be subordinated to the liens and that Ross was personally liable for the debts of Nerox Power. These are questions of law to which we apply our independent judgment.[7]

### A. The Superior Court Did Not Err by Subordinating the Two April 1997 Deeds of Trust to the Liens of M–B, Tope, and Alaska Law Offices.

■ The Alaska Supreme Court has recognized that the doctrine of equitable sub-

---

3. References to "Alaska Law Offices" also implicate any debts owed to or arguments made by Steven Jones, as Jones was an attorney for Alaska Law Offices and the services rendered appear to be the same. The two were treated as essentially the same entity by Judge Hunt.

4. *Gillum v. L & J Enterprises, Inc.,* 29 P.3d 266, 268 (Alaska 2001).

5. *City of Hydaburg v. Hydaburg Coop. Ass'n,* 858 P.2d 1131, 1135 (Alaska 1993) (quoting *Parker v. Northern Mixing Co.,* 756 P.2d 881, 891 n. 23 (Alaska 1988)).

6. *Matanuska Elec. Ass'n, Inc. v. Rewire the Bd.,* 36 P.3d 685, 700–01 (Alaska 2001) (noting that the use of a clearly erroneous standard of review for factual findings in contempt proceedings "is consistent with the deferential review used by courts in other jurisdictions"); *Berry v. Berry,* 978 P.2d 93, 97 (Alaska 1999) (referring to the "clearly erroneous" standard of review as "deferential"); *In re J.A.,* 962 P.2d 173, 175 (Alaska 1998) (also describing the "clearly erroneous" standard as "deferential").

7. *Kinnard v. Kinnard,* 43 P.3d 150, 153 (Alaska 2002) ("With respect to questions of law, we apply our independent judgment and adopt the rule that is most persuasive in light of precedent, reason, and policy.").

ordination, whereby the court may "undo or offset any inequity in the claim position of a creditor that would produce injustice or unfairness to other creditors in terms of bankruptcy results,"[8] can exist outside of the standard bankruptcy context.[9] A need for equitable subordination arises in situations of "[f]raud, unfairness, or breach of the rules of 'fair play.' "[10] It is also the case, however, that "an insolvent debtor may convey property to one creditor, even if it means that the debtor's assets will thereby be depleted, and that the claims of other creditors will be defeated."[11] In the absence of inequitable conduct on the part of a debtor, a court cannot alter the pre-existing priorities among creditors.[12] It is also important to note that we have held both that directors of insolvent corporations have a fiduciary duty to preserve the assets of the corporation for its creditors[13] and that attorneys who represent insolvent corporations and have control over their assets must also protect those assets for the creditors where they "know[ ] or should know that the director or officer intends to interfere with creditors' claims through an improper distribution of those assets."[14]

### 1. The April 11, 1997 deed of trust

#### a. The debt to William Artus

On April 11, 1997, Nerox Power recorded a deed of trust against the Jonesville mine and listed as beneficiaries William Artus and Coal Factors, Inc. Artus himself signed the deed in his role as president of Nerox Power. Debt amounts to Artus and Coal Factors were not separately listed in the deed of trust itself. The 1997 10–K report that Nerox Energy was required to file with the

Securities and Exchange Commission lists debts to Artus of: (1) $68,196 for legal services in 1996 and 1997 combined, and (2) $85,432 for a loan that Artus made to Nerox Energy in late 1996 or early 1997. However, Artus testified at trial that he was owed $79,500 for the loan. This amounts to a total debt to Artus of either $153,628 or $147,696. Nerox Energy issued 151,016 shares of stock to Artus "in conversion of debt" sometime in 1997.

The 1997 10–K report does not explain to what extent the debts owed to Artus, both from his loan and for his legal services, were satisfied by the 151,016 shares issued to him. There is no monetary value attached to the shares, although one could reasonably infer that the entire debt was satisfied by the issuance of stock. The 1997 10–K report states that Nerox Energy converted $568,168 in debt to shares of common stock in 1997 at $1.00 per share. There is nothing definitive to say that the issuance of stock to Artus was included in this debt conversion, although converting debt at a dollar per share for the 151,016 shares issued to Artus would closely approximate the combined debt owed to Artus for his loan and for legal services. Judge Hunt concluded that Artus's debt was satisfied by the issuing of the stock. She further found that the loan to Nerox Power by Artus was a capital contribution for which he received the shares of common stock in Nerox Energy. Judge Hunt found that fraud existed in these transactions:

> Mr. Artus breached his fiduciary duty to the creditors by attempting to place the interests of William D. Artus and Coal Factors, Inc., shareholders in the corporation, over the interests of third-party creditors. The execution of the deed of trust

**8.** *White v. State ex rel. Block,* 597 P.2d 172, 176 n. 13 (Alaska 1979) (quoting 6 Harold Remington, A Treatise on the Bankruptcy Law of the United States § 2874 (5th ed.1952)); *see also Great Western Sav. Bank v. George W. Easley Co.,* 778 P.2d 569, 581 (Alaska 1989).

**9.** *White,* 597 P.2d at 175–76. The United States Supreme Court held in *Pepper v. Litton* that bankruptcy courts are for many purposes "courts of equity" and thus can exercise their equitable powers to subordinate the debts of shareholders to those of outside creditors. 308 U.S. 295, 307–08, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

**10.** *White,* 597 P.2d at 176.

**11.** *Blumenstein v. Phillips Ins. Ctr., Inc.,* 490 P.2d 1213, 1221 (Alaska 1971).

**12.** *White,* 597 P.2d at 176.

**13.** *Willner's Fuel Distributors, Inc. v. Noreen,* 882 P.2d 399, 405 (Alaska 1994).

**14.** *Id.* at 406.

was done at a time when both corporations were grossly undercapitalized. Such conduct constituted a fraudulent conveyance, hindered creditors and was "inequitable conduct."

Artus contends [15] that because the amount of debt compensated by the 151,016 shares is unclear, the conveyance of the deed of trust cannot be fraudulent. However, we cannot say that the superior court was clearly erroneous in concluding that "Nerox Power satisfied any debts Nerox Power owed to Artus." Based on the 1997 10–K statement that certain unspecified debts were converted to common stock "at a price of $1.00 per share in 1997," Judge Hunt found that the stock issued in satisfaction of debt in 1997 was issued for a dollar a share. Because the 151,016 shares issued to Artus are roughly equal to the amount of money owed to Artus by Nerox Power ($153,628 based on the figures in the 1997 10–K), there is evidentiary support for the superior court's conclusion that all of Artus's debts had been satisfied, and we cannot say that this factual determination is clearly erroneous.

 Furthermore, Judge Hunt could have effected the subordination of Artus's interest in the deed of trust independently of whether or not she believed that his debt had been satisfied by the issuance of stock. Appellees M–B, Tope, and Alaska Law Offices

focus on Artus's position as an insider in Nerox Power and argue that this status supports a finding of a fraudulent conveyance to Artus's own benefit. Appellees argue that this is sufficient to support equitable subordination of the deed of trust. The law supports this conclusion. Federal courts have recognized three types of misconduct that constitute "inequitable conduct": (1) fraud, illegality, or breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtor as a "mere instrumentality" or alter ego.[16] Judge Hunt found the first two of these to exist, and her conclusions were not clearly erroneous.

The prohibition against fraudulent conveyances has been codified in Alaska law.[17] The intent to defraud through a conveyance "is a question of fact usually to be proved by circumstantial evidence."[18] Many circumstantial factors can indicate the existence of fraud.[19] "Badges of fraud must be viewed within the context of each particular case."[20] Judge Hunt found that Artus either knew or should have known that many creditors had not been paid at the time the deed of trust was recorded and that these creditors would likely claim a lien against the mining rights. In his role as a director of the company, and in his former role as a lawyer for Nerox Energy, Artus had an obligation to protect the rights and assets of the corporation for its creditors.[21] Judge Hunt further found

---

**15.** The same appellants' brief is shared by Artus, Coal Factors, Ross, Nerox Power, Nerox Energy, and various investors in Nerox Energy.

**16.** *In re Mobile Steel Co.*, 563 F.2d 692, 702–06 (5th Cir.1977); *rule summarized by In re Missionary Baptist Found. of America, Inc.*, 712 F.2d 206, 212 (5th Cir.1983); *see also In re 604 Columbus Ave. Realty Trust*, 968 F.2d 1332, 1353 (1st Cir.1992); *In re Toy King Distrib.*, 256 B.R. 1, 198–99 (Bankr.M.D.Fla.2000).

Once inequitable conduct is found, equitable subordination can be employed as long as there is either an injury to the creditor or an unfair advantage conferred to the claimant and as long as the remedy does not violate bankruptcy law. *Mobile Steel*, 563 F.2d at 700; *Fabricators*, 926 F.2d at 1464–65.

**17.** AS 34.40.010 states:

Except as provided in AS 34.40.110, a conveyance or assignment, in writing or otherwise, of an estate or interest in land, or in goods, or

things in action, or of rents or profits issuing from them or a charge upon land, goods, or things in action, or upon the rents or profits from them, made with the intent to hinder, delay, or defraud creditors or other persons of their lawful suits, damages, forfeitures, debts, or demands, or a bond or other evidence of debt given, action commenced, decree or judgment suffered, with the like intent, as against the persons so hindered, delayed, or defrauded is void.

**18.** *First Nat'l Bank of Fairbanks v. Enzler*, 537 P.2d 517, 521–22 (Alaska 1975).

**19.** *Id.* at 522.

**20.** *Blumenstein v. Phillips Ins. Ctr., Inc.* 490 P.2d 1213, 1223 (Alaska 1971).

**21.** *Willner's Fuel Distributors, Inc. v. Noreen*, 882 P.2d 399, 405–06 (Alaska 1994). Artus also had a fiduciary duty in his role as an attorney for Nerox Energy. As we have stated, attorneys face

that by naming himself as a beneficiary of a deed of trust encumbering Nerox Power's only asset for the purpose of repaying a loan and reimbursing the costs of legal services he provided, Artus ignored his fiduciary duty and engaged in inequitable conduct.[22]

We have recognized inadequate consideration, the insolvency of the debtor/transferor, and a transfer of assets in anticipation of a pending suit to be among the badges of fraud.[23] All of these existed in the present case. Judge Hunt found that Nerox Power was insolvent; that there was inadequate consideration for the deed of trust; and that Artus knew Nerox Power was likely to be burdened by mechanic's liens in light of its insolvency. These factual findings are not clearly erroneous and satisfy the fraud category of inequitable conduct.

Judge Hunt also found that both Nerox Power and Nerox Energy were "grossly undercapitalized" and that this constituted inequitable conduct.[24] The only asset of Nerox Power was the right to mine coal at the Jonesville mine, which never went into production. Judge Hunt found that Nerox Power had neither the expertise nor the equipment to run a coal mine, hence the need to hire M–B and Tope. All the funding for the

expenses of Nerox Power came either directly from Ross or indirectly from Ross via Nerox Energy. Given these facts, it was not clearly erroneous to find that Nerox Power was undercapitalized and that the deed of trust for Artus could thus be equitably subordinated to the liens of M–B, Tope, and Alaska Law Offices.

### b. The debt to Coal Factors, Inc.

Judge Hunt found that Coal Factors was a consultant to Nerox Power and had advanced them funds for use in developing the mine, making them either an investor or an unsecured creditor. Because Nerox Energy satisfied its debts to consultants by issuing stock, Judge Hunt found that the debts owed to Coal Factors had been satisfied. Coal Factors thus could not be preferred over bona fide creditors.[25] Yet, the evidence Judge Hunt cites to show that Coal Factors was a consultant actually suggests that Coal Factors was a standard contractor rather than a consultant. Furthermore, the billing statements in the record demonstrate that a substantial amount of Coal Factors's billing was for material goods provided to Nerox Power for use in developing the mine. There

a duty to protect the assets of a company for its creditors if they have control over those assets. *Id.* at 406. Creditors can bring suit against attorneys for breaching this fiduciary duty. *Id.* at 405. While there may be insufficient evidence provided to conclude that Artus had control over the assets of Nerox Power (or Nerox Energy) while he was providing only legal representation, he certainly had this control over assets, at least with regard to Nerox Power, while simultaneously serving as president of Nerox Power and continuing to offer legal representation for both Nerox Energy and Nerox Power. Artus represented Nerox Power and Nerox Energy at trial. He thus had a fiduciary duty to the creditors of Nerox Power under both prongs of *Willner's Fuel Distributors, Inc. v. Noreen.*

22. Judge Hunt considered the loan to be a capital contribution that Artus made to Nerox Power. Placing a lien on Nerox Power's assets to protect that loan would therefore be inequitable conduct. *See In re Fabricators, Inc.,* 926 F.2d 1458, 1467–68 (5th Cir.1991) (holding that obtaining a lien on corporate assets in order to secure capital contributions is inequitable conduct). Artus cannot place himself on the same level as other creditors. To allow someone who has just ascended to the head of a company to relieve

personal debts-even debts validly incurred-mocks the equitable principle of protecting the assets of a corporation for its creditors by giving one creditor an unfair advantage in raiding those assets. *Robson v. Smith* does allow directors who become secured creditors by making good faith loans to their own corporation to repay their secured debt ahead of unsecured creditors, but that is not the case here. 777 P.2d 659, 661–62 (Alaska 1989). The debts owed to M–B and Tope were secured by a mechanic's lien and the debts owed to Alaska Law Offices by a judgment lien. This situation was not contemplated in *Robson.* As Judge Hunt stated: "A debtor's conveyance to a bona fide creditor is not fraudulent merely because it prefers one creditor over another. But, a conveyance made with the actual intent to hinder, delay or defraud is not 'cured' by the mere fact that the transferee is a creditor."

23. *Enzler,* 537 P.2d at 522.

24. *See In re Fabricators, Inc.,* 926 F.2d 1458, 1467 (5th Cir.1991); *In re Mobile Steel Co.,* 563 F.2d 692, 702–04 (5th Cir.1977).

25. Alaska law requires that the preference to a creditor be a "bona fide preference." *Blumen-*

is also very little testimony at trial to support the conclusion that Coal Factors served as a consultant. However, M–B argues an alternative ground on which to affirm the equitable subordination ordered by Judge Hunt.

■ It is unclear exactly how much was owed to Coal Factors. There are no specific debt figures contained in the 1997 10–K report. Artus testified conflictingly that Coal Factors was owed $115,000 and that it was owed $130,000. Nerox Power and Coal Factors do not provide in their combined briefs any clarification of the amount owed other than to rely on Artus's testimony.[26] Because the deed of trust was drafted for payment of $191,576, subtracting the $151,016 that Artus received leaves $40,560 for Coal Factors. However, the timing between the debts incurred, the payments made, and the April 11, 1997 recording of the deed confuses matters further.

The largest expense incurred by Coal Factors—$80,000 for structural steel for a coal wash plant—was invoiced on September 8, 1997, several months after the deed of trust was recorded on April 11, 1997. It is conceivable that some or perhaps all of this expense was incurred prior to the recording of the deed of trust.[27] Certain other expenses apparently were incurred prior to April 11, 1997, even though they were not invoiced until several months later. M–B alleges that Coal Factors was only owed $27,541.44 on April 11, 1997, when the deed

of trust was recorded. Ultimately, it is impossible to get a clear accounting from the record of the expenses Coal Factors incurred before April 11, 1997.

Based upon the evidence in the record, there is insufficient justification for the amount of the Coal Factors deed of trust.[28] The record shows that prior to April 11, 1997, Coal Factors had incurred costs of $33,394.46 [29] for work done and materials provided to Nerox Power [30] and been paid $17,794.90 for these costs, leaving indebtedness of only $15,599.56. The deed of trust, as far as the record goes, provides collateral to Coal Factors for a debt of only $40,560. There is no indication in the deed of trust as to what the deed is securing and no indication of what consideration, if any, Coal Factors gave to Nerox Power to justify any amount in excess of its existing debt. This court cannot act as the accountant for Coal Factors, determining when its debts were incurred and which ones are valid for the purpose of the deed of trust.[31] Were the deed of trust clearer or the record more complete, it is possible that Coal Factors could demonstrate that it was error for Judge Hunt to shift the priority of the liens of M–B, Tope, and Alaska Law Offices.[32] As the record stands before this court, however, a sufficient implication of fraud exists with regard to the dealings between Coal Factors and Nerox Power to support Judge Hunt's conclusion that Coal Factors's interest in the

stein v. Phillips Ins. Ctr., Inc., 490 P.2d 1213, 1222 (Alaska 1971).

26. Adding up the invoices found in the record, it appears that Nerox Power owed $116,848.79 to Coal Factors, although even this amount may have been reduced by payments of $17,794.90, leaving $99,053.89 in debt.

27. At oral argument before this court, the attorney for Coal Factors contended that the material for which the $80,000 was later billed was supplied before April 11, 1997. However, this statement is unsubstantiated by the record.

28. See Miscovich v. Tryck, 875 P.2d 1293, 1304 (Alaska 1994) ("It is well established that a party's failure to designate portions of the record that are necessary to allow the determination of a point on appeal will amount to a waiver or abandonment of that point."); see also City of Whittier v. Whittier Fuel & Marine Corp., 577 P.2d 216, 223 n. 26 (Alaska 1978) (maintaining

that this court will not examine on appeal documents that are not part of the record on appeal).

29. Some of these expenses are for the full month of April and impossible to break down further.

30. This generously assumes that all costs stretching over the entire month of April were accrued before April 11.

31. Ketchikan Retail Liquor Dealers Ass'n v. State, Alcoholic Beverage Control Bd., 602 P.2d 434, 438–39 (Alaska 1979) (holding that the failure of appellee to designate in the record support for its factual claims justifies the court's adoption of the factual description asserted by appellant).

32. See Walden v. Dep't of Transp., 27 P.3d 297, 303 (Alaska 2001) ("It is well-settled that it is an appellant's responsibility to present this court with a record sufficient to allow meaningful review of his or her claims.").

deed of trust must be equitably subordinated to the claims of other creditors.

### 2. The April 21, 1997 deed of trust

On April 21, 1997, Nerox Power, with Artus as president, recorded a deed of trust encumbering the Jonesville mine and naming as beneficiaries ten entities or individuals: Duane Albert, Mr. and Mrs. L.G. and C. Brotzman, George Peterson, The Larson Family Trust, The LKL Trust, Paul F. Schroff, Robert O. Jones, Sally L. Zutter, John Wallace for the Wallace Family Trust, and Gretchen A. Ross for the Ross Family Trust and the GAR Trust. The total debt owed to all of these beneficiaries was $1,040,000. Judge Hunt found that those named as beneficiaries had already had their debts satisfied by receiving preferred shares for their capital contributions. As such, Judge Hunt determined that the interests of these beneficiaries in the deed of trust should be equitably subordinated to the claims of other creditors.

■ The primary dispute lies in who lent money to Nerox Energy to raise capital for the purchase of the Placer Dome lease. Ross stated in his deposition [33] that $800,000 was raised for this purpose and that the investors received preferred shares in exchange. He listed as lenders: "Myself, or I should say my family trust, my wife's family trust, that was the GAR trust. Last names only, Brockman; Shiba ...; Peterson; Larson; Albert ... Schroff; ... Zutter." The corresponding total amount for these names on the deed of trust is $695,000, although no amount can be found for the alleged investor "Shiba." [34] Nerox Power admits in its brief that the GAR Trust received shares of preferred stock in exchange for its loan of $400,000. Nerox Power further admits that Peterson, Larson, Albert, Schroff, and Zutter also received preferred stock.[35] Nerox Power in its brief only challenges the finding that

Mr. and Mrs. L.G. and C. Brotzman, the LKL Trust, Robert O. Jones, and the Wallace Family Trust received preferred stock.

Ross's deposition confirms that those who supplied the money for the Placer Dome lease received preferred stock for their "loans":

Q: Now the money that was paid to Placer Dome, you've already told us that came from these six or seven people you.....

A: Correct.

Q: Did you end up paying back those people the amounts that they had lent?

A: They got preferred shares in Nerox Energy Corporation.

Q: Were they ever paid back any money?

A: No, they had preferred shares.

Q: Are they still preferred shareholders of.....

A: They're preferred shareholders, correct.

As such, these people would be investors and not creditors, which would prevent them from having priority over the liens of M–B, Tope, and Alaska Law Offices because they were already compensated for the money they provided.

Artus in his testimony provides further evidence that the investors who had "provided money to acquire the coal mine" were listed as beneficiaries in the April 21 deed of trust to compensate them with "collateral for their payment" used in the acquisition of the Jonesville lease:

Q: ... [W]ho directed you to record either or both of these [deeds of trust]?

A: Myself as a director and Mr. Ross as a director.

Q: So other than yourself, Mr. Ross was the other one who directed you to do this?

**33.** Ross did not testify at trial; rather, his deposition was read into the record. Ross was not asked specifically about the financial relationship between Nerox Power and the LKL Trust, Robert O. Jones, and the Wallace Family Trust.

**34.** Nerox Power implicitly argues in its brief that a difference exists between "Brockman" and "Brotzman" by listing "Brotzman" as among those listed in the deed of trust but not named by Ross. Because Ross did not seem entirely clear in

his recollection, it was not unreasonable to assume that "Brockman" and "Brotzman" are the same entities.

**35.** In 1995 Nerox Energy issued 70,709 shares of preferred stock to raise $495,000; it is unclear if any of these shares were paid to investors in Nerox Power, although both sides seem to assume that this was the case.

A: Yes.

Q: From what Mr. Ross told you[,] what was his reasoning for reporting these two deeds of trust?

A: These people were owed money by Nerox Power Systems, Inc., and they provided money to acquire the coal mine, or for the development of the coal mine, and they were owed money and he wanted them to have some collateral for their payment.

Q: And why was he or you taking this step in recording this deed of trust at this time?

A: Because the board of directors determined it was an appropriate thing to do.

Q: And why?

A: Because these people had loaned money for the acquisition of the coal lease and/or development of the coal mine and we thought it was appropriate that they have security for payment of the debts that were owed.

By themselves, the statements of Ross and Artus are inconclusive. However, when Artus's statement that those listed on the deed of trust were the people who had provided money to start the corporation is combined with Ross's statement that those who "loaned" the money received preferred shares in return, one could reasonably reach the conclusion that those listed in the deed of trust received preferred shares for their investments. Because the mine had never gone into operation, these investors had not received any return on the money they provided to Ross and thus still could have been viewed as creditors.

There is therefore evidence to support Judge Hunt's conclusion that the parties listed in the deed of trust were investors who were compensated for their expenditures with preferred stock.[36] Nerox Power argues that no evidence was ever provided showing that the beneficiaries "engaged in any inequitable conduct." This misses the point. The issue is not whether those listed as beneficiaries in the deed of trust acted inequitably but rather whether those who recorded the deed did. The evidence in the record supports the conclusion that those who provided money to Nerox Power for the coal mine simply made a bad investment. This finding is not clearly erroneous. It was not inappropriate to conclude that to compensate these investors over the rights of bona fide creditors would be inequitable. Consequently, the interests in the mining lease held by those named in the deed of trust could be equitably subordinated to the liens by M–B, Tope, and Alaska Law Offices.

### 3. The extent of the lien

▉ In her final judgment, Judge Hunt recognized M–B and Tope as having mechanic's liens on the entire Jonesville coal mine site. Nerox Power argues that mechanic's liens only attach to the specific location at which the hired machinery was used and that because M–B and Tope did not identify the specific locations where their machinery was used, their mechanic's liens cannot extend to the entire lease site. Nerox Power urges that this interpretation is required by the language in AS 34.35.055(a).[37] However, the statute does not require so narrow an interpretation.

Although the determination of who qualifies as a lienholder is strictly construed, the

36. Further circumstantial evidence supports Judge Hunt's conclusion. For one thing, Ross testified that the total amount paid to acquire the Jonesville coal mine lease was $1,020,000: the $800,000 payment to Placer Dome, the $200,000 promissory note to Placer Dome, and a $20,000 fee to the State. This amount roughly matches the $1,040,000 owed to those listed on the April 21, 1997 deed of trust. There is also the fact that the investors seemed to have their dealings primarily with Nerox Energy, not Nerox Power. Ross stated that the investors received their preferred stock in Nerox Energy. Indeed, it appears

that the only parties who ever owned stock in Nerox Power were Nerox Energy and Hobbs Industries. Absent evidence that the beneficiaries made their loans directly to Nerox Power, it is just as likely that their debts are properly owed by Nerox Energy.

37. AS 34.35.055(a) provides:

The land upon which a building or other improvement described in AS 34.35.050 is constructed, together with a convenient space about the building or other improvement or so much as is required for the convenient use and

intent and purpose of lien laws are to be liberally construed.[38] In the present situation, M–B and Tope supplied equipment for use on the mining site. Nerox Power admits that the equipment was used on the mining site. The granting of a lien contemplates not just the physical area in which a contractor worked but also the monetary costs the contractor incurred.[39] M–B and Tope were contracted to provide equipment for the purpose of developing the entire mine site, not just a portion of it. As such, their liens should extend to the entire mine site.[40] The fact that construction was so incomplete as to make it difficult or perhaps impossible to determine the precise location or locations at which their equipment was used does not deprive M–B and Tope of recovery.

**B. Judge Hunt Did Not Err in Ruling that Nicholas Ross Was Personally Liable for the Debts of Nerox Power and Nerox Energy.**

Judge Hunt found that Nerox Energy was the "mere instrumentality" of Nicholas Ross.

As part of a sanction for failure to comply with a discovery order, Judge Hunt held Nerox Energy to be liable for the debts of Nerox Power.[41] At trial, Judge Hunt also found Nerox Power to be a "mere instrumentality" of Nicholas Ross. The finding that Nerox Power, both directly and via its identity with Nerox Energy, is a mere instrumentality of Ross allows M–B, Tope, and Alaska Law Offices to "pierce the corporate veil" and hold Ross personally liable for the debts of Nerox Power and Nerox Energy.[42]

Alaska law establishes six factors for determining if a corporation is a "mere instrumentality" of one of its shareholders: (1) whether the shareholder owns all or most of the stock; (2) whether the shareholder subscribed to all of the capital stock or caused the incorporation; (3) whether the corporation is "grossly" undercapitalized; (4) whether the shareholder uses the property of the corporation for his or her own benefit; (5) whether the directors of the corporation

---

occupation of it (to be determined by the judgment of the court at the time of the foreclosure of the lien), and the mine on which the work is performed or for which the material is furnished is also subject to the lien created by AS 34.35.050–34.35.120 if, at the time the work is started or the materials for the building or other improvements are first furnished, the land belongs to the person who causes the building or other improvement to be constructed, altered, or repaired.

**38.** *H.A.M.S. Co. v. Elec. Contractors of Alaska, Inc.*, 563 P.2d 258, 262–63 (Alaska 1977); *see also* AS 34.35.930 ("The intent of this chapter is remedial and its provisions shall be liberally construed.").

**39.** *Cascaden v. Wimbish*, 161 F. 241, 245 (9th Cir.1908) ("It is the purpose of the lien law to secure 'priority of payment of the price and value of work performed and materials furnished in erecting and repairing a building or other structure.' ") (quoting *Van Stone v. Stillwell & Bierce Mfg. Co.*, 142 U.S. 128, 136, 12 S.Ct. 181, 35 L.Ed. 961 (1891)).

**40.** *See Dannemiller v. AMFAC Distrib. Corp.*, 566 P.2d 645, 651 (Alaska 1977) ("The purposes of extending a statutory lien to the land is because the value of the land is increased when a materialperson provides labor or material for a structure which is attached to the land. The lien should extend to the land, which is benefited by

the materialperson."); *see also Mitford v. Prior*, 353 F.2d 550, 552–53 (9th Cir.1965) (holding that an entire subdivision was subject to a lien by a civil engineer who worked on the water and sewer system because the entire subdivision benefitted from the engineer's efforts even though the actual labor site was located outside the subdivision).

**41.** Ross did not challenge this order either at trial or on appeal. Consequently, any objection to it is waived. *B.B. v. D.D*, 18 P.3d 1210, 1214 (Alaska 2001) ("Matters not made issues or tried before the lower court will not be considered on appeal.").

**42.** *Uchitel Co. v. Telephone Co.*, 646 P.2d 229, 233–34 (Alaska 1982); *Jackson v. General Elec. Co.*, 514 P.2d 1170, 1173 (Alaska 1973) ("The parent corporation may also be liable for the wrongful conduct of its subsidiary when the subsidiary is the mere instrumentality of the parent. Liability is imposed in such instances simply because the two corporations are so closely intertwined that they do not merit treatment as separate entities."); *see also Murat v. F/V Shelikof Strait*, 793 P.2d 69, 76 (Alaska 1990) ("[T]he primary consideration in determining whether to 'pierce the corporate veil' is whether the corporate form has been abused by the person sought to be charged; that is, whether the corporate entity was used 'to defeat public convenience, justify wrong, commit fraud or defend crime.' ") (citing and quoting *Eagle Air, Inc. v. Corroon &*

act independently of the shareholder; and (6) whether the "formal legal requirements of the corporation are observed."[43] It is not necessary for all six factors to be satisfied before instrumentality can be found.[44] However, at least some evidence of five of the six factors can be found in the present case. This evidence supports Judge Hunt's conclusion that both Nerox Energy and Nerox Power were "mere instrumentalities" for Nicholas Ross and that Ross was thus liable for their debts to M–B, Tope, and Alaska Law Offices. Judge Hunt's factual findings are not clearly erroneous; we therefore affirm those findings.[45]

### 1. Ownership of stock

Ross admitted that he owned a controlling interest in Nerox Energy. Through Ross Production Company, Inc., for which Ross was the sole shareholder, Ross never owned less than twenty percent of Nerox Energy. Nicholas Ross admitted that Ross Production

Company had no business and was "just a shell corporation." Ross Production Company owned eighty-one percent of the shares of Nerox Power.[46] As part of the conversion of Nerox Energy into a shell corporation for purchase by outside investors, Ross Production Company assumed all of the debts and liabilities of Nerox Power. This evidence supports the finding that Nicholas Ross "was the dominant and controlling shareholder of Nerox Energy Corporation from 1992 through the end of 1998" and "exercised exclusive control over Nerox Power Systems, Inc." This finding is not clearly erroneous.

### 2. Cause of incorporation

Ross did not initially incorporate either of the companies that became Nerox Energy or Nerox Power. However, at the time Ross took control of the two companies under their former names of Gemini Energy Corporation and Gemini Operating Company, both were essentially dormant. Ross thus played

*Black/Dawson & Co., Inc.*, 648 P.2d 1000, 1004 (Alaska 1982)).

**43.** *Uchitel*, 646 P.2d at 235 (citing *Jackson*, 514 P.2d at 1173); *see also McCormick v. City of Dillingham*, 16 P.3d 735, 744 (Alaska 2001) (affirming the applicability of the six-factor *Uchitel* test for piercing the corporate veil and holding those individuals in control of the corporation personally liable for the misdeeds of the corporation). This test is an adaptation of the earlier eleven-part test in *Jackson v. General Electric* for determining if a subsidiary is a mere instrument of its parent company. *See Jackson*, 514 P.2d at 1173. *Uchitel* also establishes an alternate theory of personal liability whereby the corporate veil cannot be pierced simply if one person controls the activities of the corporation; rather the corporation must be used "to defeat public convenience, justify wrong, commit fraud, or defend crime." *Uchitel*, 646 P.2d at 234 (citing *Jackson*, 514 P.2d at 1172–73).

**44.** *Uchitel* states only that these six factors "should be considered" and does not even establish the exclusivity of the factors. 646 P.2d at 235. *See also McCormick*, 16 P.3d at 744 ("If other factors militate in favor of piercing the corporate veil, a court may impose personal liability on the control person even if he owns no stock."); *Murat*, 793 P.2d at 76–77 (considering the possibility that instrumentality could be found on the basis of only two of the six *Uchitel* factors, but ultimately rejecting the finding on the grounds of an inadequate factual basis); *cf. McKibben v. Mohawk Oil Co., Ltd.*, 667 P.2d 1223, 1230 (Alaska 1983) ("It is not necessary that all eleven of these factors [in the *Jackson*

test] be found in order to pierce the corporate veil.").

**45.** Ross urges the application of Nevada law as opposed to Alaska law in this case. Ross did not make this argument below and in fact relied upon Alaska law both in his objections to the proposed facts and conclusions and at trial. Arguments not made at trial will not be considered on appeal. *Sengupta v. University of Alaska*, 21 P.3d 1240, 1255 n. 61 (Alaska 2001) ("This court will not consider arguments on appeal that were not raised below unless the new issues either establish plain error or do not depend on new or controverted facts, are closely related to the appellant's arguments at trial, and could have been gleaned from the pleadings."). Furthermore, while Nevada law does not lay out a six-factor test with quite the clarity contained in Alaska law, it does list as factors in determining whether a company is the "alter ego" of a person "comingling of funds, undercapitalization, unauthorized diversion of funds, treatment of corporate assets as the individual's own, and failure to observe corporate formalities." *Lorenz v. Beltio, Ltd.*, 114 Nev. 795, 963 P.2d 488, 497 (1998); *Polaris Indus. Corp. v. Kaplan*, 103 Nev. 598, 747 P.2d 884, 887 (1987). These factors are substantially the same as those listed in *Uchitel*. Where there is no material difference between the competing laws of two states, the conflict of laws issue can be ignored. *Williams v. Stone*, 109 F.3d 890, 893 (3d Cir.1997); *Angelini v. Delaney*, 156 Or.App. 293, 966 P.2d 223, 227 (1998).

**46.** In June 1999 Ross Production Company sold its shares in Nerox Power to outside investors.

a crucial role in reactivating the two companies. Judge Hunt concluded that this "activation" of Nerox Power was "substantively no different than originally incorporating the corporation." Judge Hunt reached a similar conclusion with regard to Nerox Energy, which "would have gone out of existence but for the 1992 infusion of capital by Mr. Ross." When a corporation was previously dormant and thus for practical purposes non-existent, the difference between "activation" of the corporation and its initial incorporation is, for the purposes of this factor, minimal. We therefore affirm the superior court's finding.

### 3. Undercapitalization

The determination of whether the capitalization of a corporation is sufficient is based on whether the corporation has sufficient capital to satisfy its likely business obligations.[47] This matter is assessed in relation to the corporation's operations.[48] Judge Hunt found that the initial capitalization of Nerox Energy was "grossly inadequate" and that Nerox Power was "grossly undercapitalized during all relevant times." Nerox Power's only asset was the rights to the Jonesville mine, which never went into production. All of the funding for the expenses of Nerox Power came from Ross.

The finances of Nerox Power were never entirely clear, even to those ostensibly in charge. The initial president of Nerox Power testified that he could not assess whether the company was undercapitalized because he never knew what funds were in its accounts. He further testified that it was his understanding that Nerox Power had none of its own funding, but depended entirely on money from Nerox Energy. Nerox Energy, which was dependent in large part on a bankrupt Stewart Petroleum for its source of income, did not fare much better. To what extent these circumstances were business transactions gone sour and to what extent they were initial undercapitalization is hard to determine definitively. However, there is enough evidence to conclude that Judge

Hunt's finding of undercapitalization is not clearly erroneous.

### 4. Shareholder use of corporate assets

Judge Hunt found that Nicholas Ross used the corporate assets of Nerox Power and Nerox Energy for his personal benefit by: naming his family trusts as beneficiaries in a deed of trust encumbering the Jonesville coal mine lease, which was Nerox Power's only asset; using Nerox Power's coal lease as collateral for a $300,000 loan (increasing to $500,000 when interest is included) that was used to pay the operating expenses of Nerox Energy; and improving his own financial situation as the principal shareholder in Nerox Energy, and by extension in Nerox Power, through converting the debt of those two companies into shares in what he knew to be an essentially insolvent corporation. These actions alone do not clearly indicate that Nerox Power was an instrumentality of Ross. Because not all factors in the *Uchitel* test need to be satisfied to institute equitable subordination, we decline to determine whether or not the actions of Ross constitute the use of corporate assets for one's own personal gain.

### 5. Independence of directors

Judge Hunt found that the various directors of Nerox Power "took their directions" from Ross himself.[49] This finding is supported by trial testimony. Ross personally loaned $1.8 million for continuing the operations of Nerox Power, giving him substantial control over the operations of the company. Ross himself admitted that Nerox Power could not make any investments without some sort of loan from him. This is confirmed by the testimony of the two directors of Nerox Power. The first director of Nerox Power testified that he had limited involvement in the financial dealings of Nerox Power and did not even have the authority to sign checks for the company. When asked who he considered himself an employee of—

**47.** *Fiumetto v. Garrett Enters., Inc.*, 321 Ill. App.3d 946, 255 Ill.Dec. 510, 749 N.E.2d 992, 1005 (2001).

**48.** *Stirling Wanner v. Pocket Novels, Inc.*, 129 Or.App. 337, 879 P.2d 210, 213 (1994).

**49.** Ross was the director of Nerox Energy.

Nerox Power, Nerox Energy, or Nick Ross—the director answered "Nick Ross." Artus, the second director of Nerox Power, testified that as director he recorded the deeds of trust at Ross's direction. Artus further testified that it was Ross's responsibility to ensure that there was enough money to pay the bills for Nerox Power. Given the financial control that Ross exercised over Nerox Power, this finding is not clearly erroneous.

### 6. Corporate formalities

Judge Hunt's conclusions about the inadequate financial records kept by Nerox Power and Nerox Energy are supported by the record, or lack thereof. There was no documentation of the loans to acquire the Jonesville lease. There was incomplete documentation of loans from Nerox Energy to Nerox Power. The financial reports are exceedingly vague as to who received shares of stock and in compensation for what.[50] Nerox Power points in its defense to the fact that its corporate meeting minutes were transcribed. While these minutes are helpful in building a chronology of events, they do little to clarify the sources of financing for Nerox Energy or Nerox Power. The lack of record keeping by Nerox Power calls into question its existence as an independent entity and justifies the finding by Judge Hunt that Nerox Power was an instrumentality of Nicholas Ross.

## IV. CONCLUSION

Judge Hunt did not err in her factual findings that Nerox Power committed fraud in recording its deed of trust and that Nerox Power was a "mere instrumentality" of Ross. Nor did Judge Hunt err in applying the law to these findings. The decision of the superior court is therefore AFFIRMED in all respects.

MATTHEWS, Justice, not participating.

---

**50.** Indeed, Nerox Power frequently in its brief uses this confusion as a defense for being unable to attach loans and investments to compensation.